HENRY F. DUGGAN *vs.* RICHARD J. RENNICK.

Essex.     December 1, 1947. — February 26, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, RONAN, WILKINS, & SPALDING, JJ.

*Will*, Validity.     *Undue Influence.*

Upon evidence of the circumstances in which an elderly woman, physically and mentally enfeebled, thirteen days before her death and five years after making a will for the sole benefit of a needy brother who was dependent upon her and whom she had undertaken to care for, executed a new will making inadequate provision for the brother and making her principal beneficiary a nephew who had had opportunity to exercise undue influence upon her, a finding that the new will had been procured to be made by undue influence of the nephew was warranted.

PETITION, filed on July 26, 1943, in the Probate Court for the county of Essex, for proof of the will of Mary A. Rennick, late of Peabody.

A jury issue was tried in the Superior Court before *Williams*, J.

In this court the case was argued in December, 1947, before *Qua*, C.J., *Lummus*, *Dolan*, *Wilkins*, & *Spalding*, JJ., and

afterwards was submitted on briefs to all the Justices except *Williams*, J.

*L. F. O'Keefe*, for the proponent.

*J. M. Fogarty*, (*W. H. Fay* with him,) for the contestant.

QUA, C. J. This case comes here by report after a jury trial in the Superior Court upon the issue whether the will of Mary A. Rennick, late of Peabody, was procured by the fraud or undue influence of her nephew Charles Rennick and his wife Margaret Rennick or either of them. The jury answered in the affirmative. Orders of the judge on various motions appear to be the matters included within the scope of the report, but the only question of law involved is the question whether the evidence warranted the verdict.

We summarize the evidence in its aspect most favorable to the contestant. Mary A. Rennick died July 5, 1943, aged sixty-seven. Her nearest relative was her brother Richard J. Rennick, the contestant, who lived with her in one of four tenements contained in two houses which she owned worth $3,800 in all. She also left a nephew, Charles Rennick, who was the son of a deceased brother. Aside from her real estate, a diamond ring, watch, and clothing, her estate consisted of about $3,400 in bank accounts which she had received by the will of a third brother Edward, who died in 1938, a widower without issue. The real estate had originally belonged to the father of Mary and of her three brothers. After the father's death, her brothers, including Richard and the father of Charles, had conveyed their interests to Mary. There was evidence that before Edward drew his will leaving his bank accounts to Mary there was talk in Mary's presence about providing for Richard; that Edward said he was leaving nothing to Richard because he thought Mary ought to take care of everything when he went; that she would take care of Richard; and that he wanted Mary to "pass it on" to Richard. Several months after Edward's death, in 1938, Mary did make a will wherein she left all she had to Richard. Richard seems to have been in genuine need of all the assistance he could get. He was sixty-five years old at the time of the trial. For twenty-six years his "business" had been selling catnip which he pre-

pared in the cellar. He had been "on the welfare" when he came to live with Mary after Edward died. Mary gave him all his clothes. There was much evidence of affection between them. They "chummed around" every Sunday for dinner and supper and would "eat out" also on Thursdays. Mary said that if she "went" before Richard, "she had plenty for him."

This state of affairs continued until 1943, when Mary went to a convalescent home during her last illness. While there, thirteen days before her death, she made the alleged will now offered for probate. In this alleged will she gives her real estate to Charles in trust for the support and care of Richard with the right in Richard to use one of the tenements as a home during his life. Charles is to use the income from the other tenements for taxes and upkeep and to pay Richard such amount as he "deems advisable" and upon the death of Richard is to receive the real estate free of trust. Charles also receives the entire residue of the estate except two legacies of $50 each, and a legacy of a watch, and except that Mary's coat and ring and a third legacy of $50 are given to Charles's wife Margaret. By reason of this change in Mary's will, her brother Richard, instead of receiving her whole estate, would receive only an interest in one tenement as long as he occupied it and so much of the net income, if any, of the rest of a $3,800 piece of real estate as the judgment and good faith of Charles might allow him.

After Mary went to the convalescent home Charles and Margaret came to see her practically every day for the first week and on an average of two or three times a week while she was there. On the day when the lawyer came to get instructions for the alleged will Mary sent for the priest, who came and anointed her. It was Charles who sent for the lawyer. The jury were not obliged to believe his testimony that he "was told Mary wanted to make a will and was asked if he knew a lawyer." Charles and Margaret were at the home when the lawyer came. The lawyer had a talk with Charles, who told him that his (Charles's) father "did not get his share [of the property] with the others."

Margaret told the lawyer that Mary wanted her to have her diamond ring and coat and personal belongings and effects. The lawyer said he would "fix things up." While the lawyer talked with Mary, Charles and Margaret remained in a room across the hall. Charles went with the lawyer back to the lawyer's office. There was no evidence that Charles or Margaret was present a few days later, when the alleged will was actually executed. Mary did not tell Richard that she had seen a lawyer or that she had made another will, although she did tell him that the priest had been there. Mary was fond of Charles and Margaret, and there was evidence that Margaret had taken care of her in a previous illness. Charles and Margaret testified that they had never talked with her about a will.

There was much conflict in the evidence as to Mary's physical and mental condition when the will was executed. She died of coronary thrombosis, arteriosclerosis, and hypertension. There was medical evidence that these diseases often cause progressive enfeeblement of the mind. There was evidence that before the alleged will was made Mary's mind was "waning"; that she would "repeat things" and "ramble on"; that the night before the lawyer came she was "wandering in her speech" and that morning "did not recognize anyone"; that she "could not put a glass to her lips"; and that she had never said anything to her nurse about changing her will.

In the opinion of a majority of the court it cannot be said that if the jury believed the foregoing evidence a finding of undue influence was unwarranted. The meaning of undue influence is fully explained in *Neill* v. *Brackett*, 234 Mass. 367, 369. The jury could find that when the alleged will was made Mary's condition was such that very slight influence would be undue. They could find that Charles and Margaret had the opportunity to exercise that influence. They could find that Mary's brother Richard, with whom she lived, would naturally be the principal object of her bounty and needed her assistance; that her provision for him was inadequate; that in her will made in 1938 she had given him all she had; and that the new alleged will repre-

sented a material change for which the evidence supplied no adequate reason. If the deceased thought that Richard needed protection in the use of property she could have provided protection without depriving him of the greater part of her property in favor of Charles and leaving Richard almost at Charles's mercy. Moreover, the jury could find that the new alleged will was a breach of faith with the deceased brother Edward, who had intended that Richard should eventually receive his money. They could conclude that Mary would not act as she did of her own free will.

In cases of this kind the circumstances differ so greatly that extended citation of other decisions is of little value. However, similarities to the present case in various respects can be found in *Dresser* v. *Dresser*, 181 Mass. 93, *Emery* v. *Emery*, 222 Mass. 439, *Goldsmith* v. *Gryzmish*, 238 Mass. 341, *Flynn* v. *Cunningham*, 244 Mass. 306, 308–309, *Raposa* v. *Oliveira*, 247 Mass. 188, *Fitch* v. *Fitch*, 249 Mass. 550, *McMann* v. *Murphy*, 259 Mass. 397, *Eddy* v. *Eddy*, 281 Mass. 156, *Crosby* v. *Tracy*, 290 Mass. 46, and *Mirick* v. *Phelps*, 297 Mass. 250.

*Orders affirmed.*