THADDEUS KARP & another *vs.* MARY BARA & others.

Franklin. February 6, 1957. — April 8, 1957.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, &
WHITTEMORE, JJ. .

*Probate Court,* Jury issues. *Will,* Validity. *Undue Influence.*

Expected evidence of the circumstances in which a woman made a will
while at the home of a friend before a serious operation, and some nine
months later, after consultation with her long time business and
financial adviser, made a second will changing substantially gifts to
relatives and friends and other provisions in the first will and bene-
fiting a nephew by marriage and members of his family by legacies
and a gift of the residue much more than had a legacy to him alone in
the first will, and about a year after the making of the second will made
a third will essentially the same as the second after consulting only
the attorney who drew both the second and third wills, did not justify
and required reversal of an order of the Probate Court, made upon a
contest of the third will, granting a jury issue as to whether that will
was procured to be made through undue influence of the nephew or
of the adviser.

PETITION, filed in the Probate Court for the county of
Franklin on January 3, 1956, for proof of the will of Helen C.
Karp, late of Montague.

A motion for jury issues was granted as to one issue by
*Hayes, J.,* and the petitioners appealed.

*Joseph T. Bartlett,* (*William T. Woodrow* with him,) for
the petitioners.

*Francis E. Dolan, Jr.,* for the respondents.

WHITTEMORE, J. This is an appeal from an order of the
probate judge, on a petition of contesting heirs, directing
that there be tried by a jury the issue of whether the alleged
will of Helen C. Karp, dated October 14, 1954, was "pro-
cured to be made through the fraud or undue influence of
Thaddeus Karp . . . or of Chester J. Sokolosky." Karp
is the nephew of the decedent's deceased husband. Soko-
losky is named an executor with Karp, and is not a legatee.

The statements of expected testimony indicate that there was a substantially different prior will dated January 25, 1953, and an intervening will of October, 1953, which was just like the will offered for probate except that the amount of the legacy for the saying of masses was reduced.

The principal differences in the wills of January 25, 1953, and October 14, 1954, are these:

(a) By the earlier will $5,000 was left to the decedent's sister, in Poland, or if she was not living to her two sons, in Poland. By the later will the sister is to receive the proceeds of household furniture and effects, invested in clothing for her, and also the decedent's own clothing and personal effects, and each of the sister's sons is to receive a legacy of $1,000. These two money legacies are each subject to the condition that one half of the legacy is to lapse at the end of ten years, and the balance at the end of fifteen years, if in each such period the prohibition of United States law against sending money to Poland is not removed or the legatee does not gain admission to the United States.

(b) In the earlier will a nephew and a brother of the decedent's husband, in Poland, were each to receive $2,000 and a great grandniece of his in Poland was to receive $3,000.[1] The later will reduces the legacies to the nephew and brother to $1,000 each, continues the legacy to the great grandniece in the same amount, and makes all three legacies subject to the condition which applies to the legacies to the decedent's nephews in Poland.

(c) The earlier will gave $1,000 to Thaddeus Karp and nothing to any member of his family. The later will gave to Thaddeus and his wife Veronica the residue of the estate and to his son Robert $3,000 and son Eugene $2,000. The legacies under the earlier will totaled $19,250 and there was no disposition of the

---

[1] Said to have been described in the earlier will as a niece of the decedent.

residue of an estate estimated in January, 1953, at
$28,000. The legacies under the later will totaled
$13,100 so that a gross residue of up to $15,000 was
indicated with whatever accretions might come from
lapsing legacies. Counsel stated that the decedent in
connection with making the will of October, 1953, had
in mind $9,000 for Karp.

(d) Two local friends who had been given $1,000
and $500 respectively in the earlier will were omitted
in the later one. A gift to a godchild was reduced
from $1,000 to $500. Earlier specific provisions for a
monument ($1,500) and funeral expenses ($1,250) were
omitted in 1954.[1] The earlier will provided $500 for
masses, the intervening will of October, 1953, provided
$2,000 for this purpose and the offered will provided
$100.

The statements of expected testimony indicated also that
facts as follows might be proved: Karp and his family visited
the decedent in July of 1953 for about a week; this was the
first time she had seen him, although they had corresponded;
she was "delighted" when he came. Sokolosky had been
financial and business adviser to the decedent for many
years and had made out her tax returns. A still earlier will
had left him a substantial legacy. On January 25, 1953,
being in the home of a friend and faced with a very serious
operation, the decedent sent for an attorney to draw a new
will and through an interpreter directed that the legacy
to Sokolosky be omitted and that the will of that date,
as described herein, be drawn. From time to time after
January 25, 1953, the decedent said that Sokolosky was
"hounding her to make out a will" and that she was "afraid
to tell him I've got a will." After making the will of January
25, 1953, the decedent notified legatees in Poland of their
prospective legacies and wrote her sister that she "feared

[1] The later will provided, "I direct that my executors have my date of
death properly inscribed on my headstone at the Polish Cemetery in said
Turners Falls"; and also provided for the "payment of my just debts and
funeral charges."

dishonesty" and to keep the letter as she might need it.
The friend to whom $1,000 was left in that will was the one
in whose house that will was made. She was named execu-
trix in that will. There were statements and actions indicat-
ing that the decedent trusted her. The decedent wrote to
the relatives in Poland that her affairs were in the hands of
that friend. She told the friend that she wanted "to be
buried here and you to take care of me." On the other
hand she had on two occasions stated to a neighbor that she
did not entirely trust that friend although "I have to be
nice to . . . her." The will of October, 1953, was made
after consultation with Sokolosky following her statement
to him that she had a will but was not satisfied with it. He
asked an attorney (not the one who drew the January, 1953,
will) to attend a conference at which he had a memorandum
of what the decedent had told him she wanted to do with
her money. A final draft was gone over by the attorney
with the decedent. Sokolosky acted as interpreter, but the
decedent also spoke directly with the attorney. In October,
1954, the decedent came alone to the attorney and requested
the change in the provision for masses. The decedent then
said it was her will and "I won't have to change it again,
I'm pretty sure." The decedent told a friend that the
reason she "did not leave a substantial sum of money out-
right to her sister . . . was because she was old and she was
leaving it to the children instead." She also said that a lot
of this money was earned by her husband and she thought
his people should benefit by it. During the last two years
of her life the decedent suffered memory lapses and was in
failing health. She was a good business woman and attended
to her own affairs and lived a normal life until she suffered
a cerebral hemorrhage on October 3, 1955. She died De-
cember 20, 1955, of a coronary thrombosis.

It was stated by counsel that Thaddeus Karp would tes-
tify that he never spoke or wrote to the decedent about how
she should leave her property and that Sokolosky at no time
told her what to "do with her money" or "said anything to
influence her" in this respect and did not know Thaddeus

Karp, had never communicated with him and had never met him or "contacted him." There was no suggestion that there would be evidence to the contrary.

On this prospective testimony it would be purely conjectural whether undue influence of Karp and Sokolosky, either or both, induced the changes in the will. Of course Karp could have procured Sokolosky to influence the decedent to favor him and to scale down or omit other gifts, but except for the changes actually made there is no indication of evidence that this occurred and there is suggested evidence and reasonable inferences which can be drawn to account otherwise for the changes which were made. These include the inference of an awakened interest in and liking for the husband's nephew and his family presumably not existent before the decedent became acquainted with them. There is no exclusion of persons who would naturally be the principal objects of the decedent's bounty and in need of her assistance as was the case in *Duggan* v. *Rennick,* 322 Mass. 425. In that case additionally the evidence supplied no adequate reason for the material change. The making of changes in testamentary dispositions with changing circumstances and wishes is natural and a common occurrence. The decedent's actions are consistent with such motivation unaffected by suggestions by other persons. That Sokolosky "hounded" the decedent to make a will and that she was "afraid to tell him" she had a will are at least as consistent with embarrassment at having arranged for and executed an important document without consulting the long time business adviser as they are with fear that he would attempt to control her wishes. There is nothing but conjecture which connects the decedent's fear of dishonesty with Sokolosky and there is affirmative indication of other possible explanation for it. The independent reaffirmation by the decedent to her attorney of all the relevant dispositions is significant.

We attribute, as the rule requires, some weight to the decision of the probate judge and recognize the element of discretion vested in him. *Clark* v. *McNeil,* 246 Mass. 250,

255.   *Hannon* v. *Gorman*, 296 Mass. 437, 438.   But having done so we do not find "a genuine question of fact supported by evidence of such substantial nature as to afford ground for reasonable expectation of a result favorable to the party requesting the framing of issues."   *Smith* v. *Patterson*, 286 Mass. 356, 358–359, and cases cited.

Although the rule and practice are such that in most cases the decision of the probate judge prevails, the requirement of uniformity of practice under, the statute (G. L. [Ter. Ed.] c. 215, § 16) demands that it be "subject to the corrective determination of this court."   *Clark* v. *McNeil*, 246 Mass. 250, 255.   In cases of this kind the "extended citation of other decisions is of little value."   *Duggan* v. *Rennick*, 322 Mass. 425, 429.   See, for a reversal of the order below, *O'Brien* v. *Collins*, 315 Mass. 429.

*Order of the Probate Court reversed.*