ESTHER T. BURNS *vs.* HARRIET E. DUNN & others.

Middlesex. February 2, 1960. — March 10, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Probate Court,* Jury issues. *Will,* Validity, Execution. *Undue Influence. Unsound Mind.*

Nothing in statements of expected evidence in a contested will case showed that the will, drawn by an experienced attorney and leaving the testator's property to three of several first cousins, was procured by undue influence in fact exercised on him, even if there was opportunity to exercise it. [528]

Statements of expected evidence in a contested will case showing that the testator, an elderly man, was very ill and feeble at the time, three days before his death, when he executed his will at a hospital, signing by mark although he was educated, justified the granting of jury issues as to due execution and testamentary capacity despite expected evidence that at the time of execution of the will, which was drawn by an experienced attorney, the testator was competent to make a will, knew what he was doing, fully understood the contents of the will when it was read to him, and stated that it was what he "want[ed]." [531]

PETITION, filed in the Probate Court for the county of Middlesex on August 26, 1958, for proof of the will of John R. Coughlin, late of Lowell.

A motion for jury issues by the contestants was heard by *Monahan, J.*

*James P. Cassidy,* for the proponent.

*John F. Donohoe,* (*Thomas M. A. Higgins & John J. Toohey* with him,) for the contestants.

CUTTER, J. This is an appeal from an order of the Probate Court framing, with respect to an instrument dated August 18, 1958, offered as the will of one John R. Coughlin, jury issues related to due execution, testamentary capacity, and undue influence. Coughlin died August 21, 1958. The mo-

tion for jury issues was heard upon the statements of counsel. See *Spilios* v. *Bouras,* 337 Mass. 176, 177, and cases cited.

Coughlin was seventy years old at his death and had never married. He was a man of character and strong mind, deeply religious, and possessed of business ability.

The beneficiaries named in his will were three sisters, first cousins, who had lived within walking distance of each of the houses in Lowell in which Coughlin had lived. Thirty years younger than Coughlin, they had shown kindness over many years to his blind mother and had been close to him and saw him often. He was interested in them and the children of one of them. He seems to have been on less good terms with some at least of the contestants, also first cousins, and saw some others of them infrequently. The will, not an unnatural one for him to make, was drawn by an experienced lawyer who had known Coughlin for twenty-five years and had represented him in various matters from 1942 to Coughlin's death.

1. We perceive no expected evidence presenting any substantial issue of fact relating to undue influence upon which the contestants could reasonably hope to prevail. It was stated that Coughlin was fond of some of the contestants and that he had spoken to three of them in terms showing his intention to divide his estate among all his cousins and to name one contestant his executor. It was stated also that one of the beneficiaries, a registered nurse, had served as one of Coughlin's nurses at the hospital and that she on her own initiative had called Coughlin's lawyer on August 16, 1958, to ask the lawyer to go to a hospital to see Coughlin "about his finances"; that Coughlin executed a power of attorney given by him to one of the beneficiaries under which she withdrew $3,000 from one savings account, although Coughlin had $800 in his possession and more in a checking account; that the beneficiaries called the lawyer to make the will of August 18, 1958; that the three beneficiaries were in a corridor in the hospital, near Coughlin's room, when the will was signed; that the beneficiaries con-

cealed Coughlin's illnesses from the contestants; and that one of the named beneficiaries, on August 14, had effected a transfer of Coughlin's safe deposit box into her own and Coughlin's joint names.

Nothing in the statement shows that the beneficiaries in fact exercised any influence upon Coughlin. Even if there might have been opportunity for undue influence by these beneficiaries, that would not be enough. *Abbott* v. *Noel*, 337 Mass. 133, 139. Coughlin's actions were guided by his own lawyer. Cf. *Morin* v. *Morin*, 328 Mass. 33, 36. The contestants do not argue that the lawyer acted improperly. A jury issue should not have been framed with respect to undue influence.

2. No expected evidence is stated showing that, prior to June 9, 1958, the decedent lacked testamentary capacity. On that day he was admitted to a hospital suffering from difficulty in breathing, heart trouble, carcinoma of the prostate, and a swelling of the limbs. He was in a nervous state. On July 11, 1958, he "was discharged . . . improved fairly good" but with a "guarded" prognosis. He was readmitted to the hospital on August 14 after suffering a "cerebral hemorrhage and congestive heart failure."

On the 18th, the day the will was executed, he was a very sick man in feeble condition when at about 11 A.M. he signed his will by mark. This short document was drawn at the hospital by his lawyer's secretary in longhand after a conversation with the lawyer in which Coughlin indicated his wishes briefly. The secretary "read the will slowly to . . . Coughlin who was listening." At his "request she repeated paragraph disposing of the . . . property to the three girls." His lawyer asked, "Do you understand?" Coughlin replied "Yes" and in answer to another question said, "Yes, that is what I want." The lawyer then told Coughlin "that if it were more convenient for him to sign by . . . mark it would be all right . . . . The nurse gave . . . Coughlin the pen" and "held the will and . . . Coughlin's hand while he made his mark." He replied "Yes" when the lawyer asked whether he wanted the witnesses to act as

such and watched them as they signed in his presence and in the presence of each other.

The principal questions argued with respect to due execution of the instrument and Coughlin's testamentary capacity relate to his physical condition on August 18. The statements of expected evidence, which included hospital records and nurses' notes, show that he was in an oxygen tent. He was "given two cc.'s of sodium luminal" at 7 A.M. During the morning he had periods of severe convulsion, "tremors of the hands and legs and spasms of facial muscles caused by nerve pressure." At times he had no pulse and respiration was "shallow" but it recovered. At 9:40 A.M. he was given codeine. At 10:45 A.M. he had an "extremely severe" convulsion which lasted eight minutes, but his "pulse [was] strong and regular after seizure." It was stated that a witness, a daughter of one of Coughlin's cousins not named in the will, will testify that just after this seizure she entered the decedent's room where he "was in an oxygen tent with his eyes closed; that she talked with the nurse . . . that the decedent did not arouse while she was in the room." The same witness is expected to testify that "after the attorney and other attesting witnesses left the room . . . [she] reentered the . . . room and found him" in the same state. Coughlin's "attorney was quite concerned about the decedent's condition and asked one of the nurses if she thought . . . [he] was able to sign papers because . . . '[h]e is so sick.'" At 11:35 A.M. and at 11:40 A.M., after the lawyer's visit, he had a one minute convulsion and at 12:10 P.M. a more severe convulsion. He was visited by Dr. Hajjar at 8:50 A.M. and at 12:50 P.M. At 2:40 P.M. he had a severe convulsion and was "nonresponsive." At 3 P.M. he "responded to visitors and priest." Later in the day he had other convulsions.

The contestants state that they "expect to produce expert testimony that if the . . . will was read to the decedent . . . he was mentally incapable of understanding its contents . . . and of forming an intention to make a will."

No mention was made of the name of the expert, or whether he actually saw Coughlin at any time. The contestants "contend that the execution . . . by a most unusual and vague scroll may or may not have been made by the decedent." The contestants further offer to show that Mrs. "Graham, one of the beneficiaries [named in the will], is a registered nurse; that she took over special duty on the three to eleven shift during the decedent's last hospital stay; . . . that the hospital records will show a pattern . . . that whenever [Mrs. Graham] . . . was on duty her reports minimized his condition and attempted to give the impression that he was much improved, especially around the time of the execution of the will."

Many aspects of this case, of course, tend to the denial of jury issues. The proponent has made a detailed statement of expected evidence about the execution of the will, which suggests no irregularity. We perceive nothing in so much of the hospital record as is set forth in the statements of counsel indicating any pattern in the reporting of Coughlin's condition by the nurses on duty at different hours on August 18. There is no expected evidence of any mental confusion or misapprehension of facts by Coughlin such as was present in cases like *Goddard* v. *Dupree*, 322 Mass. 247, 249–250, and *Santry* v. *France*, 327 Mass. 174, 176–177. The expected expert testimony is stated in general terms and is not shown to be based upon all the facts or upon any observation of Coughlin. See *Taylor* v. *Creeley*, 257 Mass. 21, 26–27. A testator may sign by mark (see *Paglia* v. *Messina*, 270 Mass. 1, 2) or have someone execute the will for him "in his presence and by his express direction." G. L. c. 191, § 1. *Steele* v. *Marble*, 221 Mass. 485, 487–488. The fact, however, that a man of reasonable education and business capacity does sign by mark may be of some significance in determining his physical condition.

Weight, also, is obviously to be attached to the statement that Dr. Hajjar, Coughlin's family physician, will testify that "on August 18 . . . [Coughlin's] mind was clear and he knew exactly what he was doing and was perfectly com-

petent to make a will"; that he "found . . . Coughlin clear and bright and friendly as usual"; that on "that day . . . Coughlin told Dr. Hajjar that he was going to leave whatever he had to" the three cousins named in his will; that on Friday, August 15, Coughlin had told the doctor he wanted to make his will and that his lawyer was coming on Monday; and that Coughlin "had often told Dr. Hajjar how good the three girls . . . were to him . . . and he didn't know what he would do without them." The doctor "never knew that . . . Coughlin had any relatives except these three girls."

The probate judge correctly viewed this as "a close case" upon the framing of jury issues. We infer that he exercised in favor of framing issues that element of discretion (see *Santry* v. *France*, 327 Mass. 174, 177–178; *Karp* v. *Bara*, 335 Mass. 681, 685) which exists in such cases. Giving due consideration to his decision and to all the circumstances, we cannot say that the contestants have failed to present a genuine issue of fact as to (a) testamentary capacity and (b) due execution, in respect of Coughlin's ability to understand fully what he was doing. We reach this conclusion solely because of the doubts raised by Coughlin's weak and precarious physical condition on August 18. On these issues this is the opinion of a majority of the court.

3. The order framing jury issues is to be modified by striking out the issue as to undue influence, and as so modified it is affirmed.

*So ordered.*