DONALD R. ERB vs. RICHARD LEE.

Worcester.  November 12, 1981. — February 1, 1982.

Present: HALE, C.J., ROSE, & DREBEN, JJ.

*Undue Influence.  Will,* Validity.

At a hearing on a petition brought by a decedent's attorney for the pro-
bate of a will, the allowance of which was opposed by the decedent's
grandson, the evidence was sufficient to support a probate judge's find-
ing that the decedent's housekeeper had exerted undue influence over
her to cause her to draw a will leaving her property to the housekeeper.
[124]

Discussion of undue influence and its effects on the drawing of a will.
[124-126]

PETITION filed in the Worcester Division of the Probate
and Family Court Department on December 4, 1978.

The case was heard by *McManus,* J.

*Richard Clarke Pease* for Flora Bates.

*John Evans* for Richard Lee.

HALE, C.J.   This is an appeal by Flora Bates from a
decree disallowing a petition brought by Donald R. Erb for
the probate of an instrument purporting to be the last will
of Maud E. Buzzell (decedent). Richard Lee, grandson of
the decedent, opposed the allowance of the petition. A pro-
bate court judge found that the decedent was without testa-
mentary capacity when the will was executed.  He also
found that the will's execution was not the free act of the
decedent but the result of Bates's exercise of undue influence
over her.[1]

---

[1] The instrument provided that all the property of the decedent would
pass to Flora Bates except $2,000, which was to go to the church which
the decedent attended.

Bates argues that there was insufficient evidence to find lack of testamentary capacity and undue influence. We hold that there was sufficient evidence to support the judge's finding of undue influence, and in so holding, do not address the issue of testamentary capacity.

There was evidence warranting the judge in finding the following facts. In late 1969 or early 1970 the decedent, then approximately eighty-five years old, hired Bates as a housekeeper. The decedent was a mentally alert individual but was elderly and somewhat frail and thus required Bates's help to maintain her independence in her home. Bates also ran errands for the decedent and took her shopping and other places in her car. The relationship between them was initially a good one.

As time went on, the decedent's physical condition deteriorated. Because of her physical condition Donald Erb, her attorney, was appointed conservator on August 21, 1973, to manage the decedent's funds and pay her bills. In the summer of that year trouble began to develop between the decedent and Bates. Bates began to harass the decedent for money, furniture and personal things, and the decedent complained about this harassment to Mr. Erb, Richard Lee, and the rector of the Episcopal Church that the decedent attended. The decedent then directed Mr. Erb to draft a letter dismissing Bates, and she was dismissed soon thereafter. Rita Jeremiah replaced Bates as the decedent's housekeeper.

Soon after her dismissal, Bates began to phone the decedent at all hours of the day and night to harass her about money which Bates claimed was due her. Some of the calls made after dark particularly frightened the decedent. Bates also wrote a letter to Mr. Erb demanding back wages, and after discussing the matter with the decedent, he paid her the amount she claimed was owing. Some time prior to all of this, Bates had discussed with the rector a cash gift which the decedent had given to the church. Bates stated to him that the money had been improperly used and that the church should not have received the money.

Jeremiah's job as the decedent's housekeeper lasted only about five months. One day when she arrived at the decedent's home for work she was met by Bates leaving the house with the decedent. Bates told Jeremiah only that, "You're no longer needed here," and from that day Bates resumed her duties as the decedent's housekeeper. No arrangement for payment was made with the decedent's conservator concerning Bates's resumption of duties.

After Bates returned to the employ of the decedent, there was no indication of trouble between the two women. However, in the summer of 1974 the decedent had an incident with her grandson, Richard Lee. She had had a dispute in June, 1974, with Richard's father concerning some flowers which were planted at the graves of her husband and daughter, and at some point after that she refused to talk with Richard when he visited her. When asked by Richard on that occasion why she would not let him into her house, she stated only, "You know why," and, "I don't want you here. I want you to go." A neighbor observed that there was quite a commotion when this incident occurred and that Bates was not present during the incident.

On the occasion of a July 13, 1974, appointment with her physician, the decedent was upset and stated that she was having legal problems with her will and that Richard was interfering in her affairs. Mr. Erb also had conversations around this time with the decedent regarding Richard. The decedent told him that Richard had asked for one hundred dollars and she wanted Mr. Erb to give it to him. He told her that he could not because as conservator he could use her money only for her expenses. She seemed relieved on finding that out, commenting that Richard frequently asked for funds and that he and his wife acted as though her property belonged to them. After the incident with his grandmother concerning the flowers, Richard resumed his visits to her home, and he perceived their relationship to be the normal, friendly one that had existed prior to the incident.

In June of 1974, the decedent consulted Mr. Erb about drawing a new will. The decedent's previous will had

named Richard as the principal beneficiary, but she wanted that changed so that Bates would be the principal beneficiary. When asked by Mr. Erb why she wanted to make the change, she stated that it was because Bates had been good to her for so long. And when asked whether Bates had requested that she change her will, she replied that Bates had not. Mr. Erb drew the will at this time but intentionally held off having her execute it because it was such a drastic change from her earlier will. After several inquiries by the decedent regarding whether the will had been prepared, Mr. Erb arranged for its execution on August 21, 1974, and requested her physician to be present as a witness.

At the execution of the will Mr. Erb, his secretary, and the decedent's physician were present as witnesses. Prior to her signing the will Mr. Erb asked the decedent a series of questions concerning her next of kin and the quantity of property being disposed of by the will. When asked about her granddaughter, her only living relative other than Richard, she initially stated that she did not have a granddaughter. She then remembered her granddaughter Judith, however, after being reminded of her by Mr. Erb. She stated that she owned her house and its furnishings, and she knew that Mr. Erb, as her conservator, was holding money belonging to her in the bank. But she did not know the amount of money she had in the bank, nor did she know what bank the funds were in. She was asked if Bates discussed the will with her, and she answered, "No . . . she [Bates] stated that she didn't want a cent from me." Mr. Erb asked whether Bates had asked her to make this will, and she responded in the negative. When asked if Bates had ever asked to be left any of her money in a will, the decedent replied, "No, she will be surprised by this. I think that this will surprise her very much." The will was then read to the decedent word for word, and she stated that she understood it. When asked to summarize its provisions, she said, "It does all that I want it to do." She signed it in the presence of the witnesses. At that time she appeared to the witnesses to be alert and acting of her own free will.

There was no indication after the will was executed that any trouble existed between the decedent and Bates or between the decedent and her grandson. The decedent was admitted to a nursing home in the summer of 1975. She died on November 26, 1978.

The question to be answered is whether the evidence is sufficient to support the judge's finding, which he based on all the evidence before him,[2] that Bates exerted undue influence over the decedent to the extent necessary to cause her to draw a will leaving her property to Bates. The case is a close one. We can reverse a judge's finding based on evidence only when it is "plainly wrong" (see *Olsson* v. *Waite*, 373 Mass. 517, 520 [1977]), i.e., when the evidence, with every reasonable inference which can be drawn from it, is insufficient to warrant the findings. *Cambridge* v. *West Springfield*, 303 Mass. 63, 66 (1939). Giving due deference to the judge's ability to appraise and weigh the oral testimony before him (see *Emery* v. *Emery*, 222 Mass. 439, 442 [1916]), we hold that the evidence and the permissible inferences therefrom support the judge's findings. Compare *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. 304, 310 (1981).

One of the most complete discussions of undue influence and its effects on the drawing of a will can be found in *Neill* v. *Brackett*, 234 Mass. 367 (1920). That discussion need not be repeated, but we draw attention to its recognition of subtle, imperceptible conduct which can give rise to irresistible domination. *Id.* at 369. In determining whether the decedent was subject and susceptible to Bates's influence the judge could have considered the decedent's weakened mental condition (*Fitch* v. *Fitch*, 249 Mass. 550 [1924]), especially in light of the intimate relationship that existed between Bates and the decedent. *Neill*, 234 Mass. at 369.

---

[2] The judge made a number of subsidiary findings, but in his ultimate findings his use of the words "I find that there is sufficient evidence" and "on all the evidence" made it clear that those findings were not based solely on the subsidiary findings.

We note that the contestant had the burden of proving undue influence. *Morin* v. *Morin*, 332 Mass. 223, 224 (1955). Bates's status as friend and housekeeper did not rise to the level of a fiduciary relationship which would create, as a matter of law, a suspicion of undue influence. *Richardson* v. *Bly*, 181 Mass. 97, 101 (1902). Nor would a presumption of undue influence arise because of the decedent's advanced age (see *Bruno* v. *Bruno*, 10 Mass. App. Ct. 918 [1980], *S.C.* 384 Mass. 31 [1981]) or because Bates had the opportunity to exert such influence. See, e.g., *Flynn* v. *Prindeville*, 327 Mass. 266, 269 (1951); *Burns* v. *Dunn*, 340 Mass. 526, 528 (1960); and *Plakas* v. *Plakas*, 11 Mass. App. Ct. 922 (1981).

But there was evidence of more than Bates's mere opportunity to exert undue influence over the decedent. There was evidence of her attempts to persuade the decedent to give her money and property, which resulted in her discharge from employment. There was Bates's intermeddling in the affairs of the decedent's church and its use of money which the decedent had donated to it. There were the frightening phone calls asking for more money made to the decedent by Bates after her discharge. Then there was also Bates's abrupt return as the decedent's housekeeper and her ouster of Jeremiah without making any arrangements for compensation with Mr. Erb.

Undue influence need not be exerted at the time a will is made; it is enough that it be operative at that time. *Conn* v. *Starr*, 335 Mass. 726, 728 (1957). The often imperceptible nature of undue influence would allow a finding that it existed at the time the will was executed even though an objective observer at the execution could detect no indication of it. Thus, although the conditions surrounding the execution of the will — Mr. Erb's diligence in making sure the decedent understood the provisions of her will and that she was competent to do so, and the decedent's assurances that the will accomplished what she wanted — could be looked at in isolation as requiring a reversal of the judge's finding of undue influence, the existence of contrary evi-

dence before the execution would make a reversal improper. Bates's domineering personality and harassing requests for money and property were evidence of undue influence. And these events, followed by the drastic change in the will after Bates brought herself back into the decedent's employ, supported a finding that the will's execution was the result of Bates's undue influence over the decedent. The judge could also have drawn an inference adverse to Bates from her failure to testify concerning her relationship with the decedent. See *Commonwealth* v. *United Food Corp.*, 374 Mass. 765, 771-772 (1978). See also 2 Wigmore, Evidence § 285 (1940).

"What we have said shows that the case was one which had two sides to it and that, whichever way the judge who heard it decided it, it could not be said that his decision was plainly wrong.

"It was for the trial judge to say, taking into account the [decedent's] age and her general condition of health, her mental constitution and her dependence upon some one for care and attention, whether she could or could not be unduly influenced." *Campbell* v. *Lima*, 212 Mass. 11, 13 (1912). See also *Fitch* v. *Fitch*, 249 Mass. at 552.

As the decree entered has, by reason of obvious inadvertence, retained printed words of the probate form which should have been struck, the decree is modified by striking all of the material appearing in the last six lines preceding the last paragraph and, as so modified, is affirmed.

*So ordered.*