NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-741

IN THE MATTER OF THE ESTATE OF RALPH PARKER CHRISTIE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Ralph Parker Christie (decedent) died on December 2, 2017, shortly after his ninetieth birthday.  His last will and testament dated January 30, 2017 (will or 2017 will), named Christopher J. Chetwynd, whom the decedent had known for three years prior to the execution of the will, as the primary beneficiary and nominated Chetwynd as personal representative of the estate.  Chetwynd filed a petition for formal probate of the will and appointment as personal representative in the Probate and Family Court; the decedent's niece, Donna J. Madore (Donna),[1] objected that the will was the product of undue influence.[2] After a trial, a judge found that Chetwynd had exercised undue

_____

[1] Because Donna and David Madore share a surname, we use their first names.

[2] The probate judge allowed the Salvation Army's motion to intervene prior to trial.  The Salvation Army joins Donna's brief in this appeal.

influence over the decedent.[3]  Chetwynd now appeals from the decree denying his petition for formal probate of the will, arguing that the judge improperly shifted the burden of proof to Chetwynd and the evidence was insufficient to support the finding of undue influence.  We affirm.

Background.  The judge found the following facts.[4]

1. Decedent's relationship with Donna and Chetwynd.  The decedent spent a significant amount of time with Donna and her husband, David Madore (David), during his lifetime.  From 1990 to 2014, the decedent traveled to Washington each summer to see the Madores and typically stayed with them for four to six weeks.  Those annual visits ceased after 2014 as the decedent's health began to decline, but the decedent remained in touch with the Madores by telephone a few times per month.

By fall of 2014, the decedent was suffering from dementia, confusion, poor judgment, decreased comprehension, impulsivity, and memory deficits.  His physical health began to decline the following year.  He used a walker as his strength, balance, and endurance decreased.

---

[3] Donna also objected based on lack of capacity.  The trial judge found that the decedent had testamentary capacity at the time that the will was executed, and the parties make no argument about that finding.

[4] To the extent some of the facts contained herein were disputed at trial, we conclude that these facts were supported by the record based on our own independent review.

2

It was around this time that the decedent met Chetwynd.  In January 2014, the decedent brought his car in for service at the car care center where Chetwynd worked.  The decedent was eighty-six years old and lived by himself in an apartment in Quincy.  As the decedent sought further repairs for his car, he formed a relationship with Chetwynd.  Chetwynd and the decedent had several shared interests, including baseball, cars, and history, as well as their mutual involvement in the Free Masons.  As their friendship formed and until his death in 2017, the decedent spent holidays and birthdays with Chetwynd and Chetwynd's family, including his two children, and attended other events with them.

Shortly after they met, Chetwynd advised the decedent that he should replace his car and brought him to the car dealership where Chetwynd had previously worked.  The decedent purchased two vehicles from that dealership over the course of a few months in 2014.  Not long after the decedent purchased the first vehicle, a 2010 Chrysler Sebring, he was involved in a car accident that caused the total loss of the vehicle.  The decedent's driver's license was suspended as a result of the accident; however, the decedent purchased a brand new fire engine red Dodge Challenger with a V6 engine (Challenger).  The decedent ultimately was unsuccessful in getting his license

3

reinstated, and the dealership refused to let him return the Challenger.

Because the decedent did not have a license, he relied on Chetwynd for transportation, including to the grocery store and medical appointments, beginning in the summer of 2014. Less than a year later, in the spring of 2015, Chetwynd was involved in a car accident in his own vehicle while driving the decedent to an appointment. After the accident, Chetwynd and the decedent executed an agreement that the decedent would transfer title of the Challenger to Chetwynd with the option to rescind the "gift" at any time. The decedent remained financially responsible for all expenses related to the vehicle under the agreement and he paid all expenses for the Challenger, including car payments, insurance, taxes, maintenance, and repairs, until his death. In exchange, Chetwynd agreed to provide rides to the decedent, but also was permitted to use the Challenger for his own personal and professional use. The car agreement was drafted at Chetwynd's request by Eileen Lawlor, an attorney with whom he was acquainted; Lawlor did not review the agreement with the decedent before it was executed. Shortly after the agreement was executed, Chetwynd also began assisting the decedent in writing checks, including to pay for installation of a spoiler on the Challenger. Although Chetwynd had been in

4

contact with the Madores about the decedent at this point, Chetwynd did not give them a copy of the car agreement.

2. _Healthcare proxy and power of attorney_.  In 2015, on advice from an elder services agency, the Madores and Chetwynd discussed whether the decedent would agree to put in place a power of attorney and healthcare proxy.  If the decedent agreed, Donna offered to make an appointment with the same attorney who represented the decedent in connection with his driver's license, and to travel to Massachusetts to attend the meeting. The decedent in fact already had executed both documents in 2011, and named Attorney Mark A. Leahy as his agent and attorney in fact as well as his healthcare proxy.  Attorney Leahy had represented the decedent since at least 2002.

Notwithstanding the prior healthcare proxy, Chetwynd printed a form from the Internet and filled it out listing himself as the decedent's healthcare proxy.  The decedent then signed the form (HCP).  Chetwynd did not give the Madores a copy of the HCP, but they were aware of the HCP after the fact.

On Chetwynd's own initiative in January 2016, he contacted Attorney Rebecca McWilliams, whom he had known for several years through work on political campaigns, to prepare estate planning documents for the decedent.  Before McWilliams spoke with the decedent, she drafted and sent to Chetwynd a power of attorney. The following month, Chetwynd took the decedent to McWilliams's

office where the decedent executed a so-called "springing" durable power of attorney (2016 POA) that appointed Chetwynd as his attorney in fact contingent on first obtaining a written statement from a licensed physician indicating that the decedent was incapable of "attending effectively to [his] financial affairs by reason of mental or physical disability."  At the time, the decedent told McWilliams that he did not have a power of attorney, despite his previous appointment of Attorney Leahy. Chetwynd did not tell the Madores about the 2016 POA and they learned of it only days before trial.

During Attorney McWilliams's meeting with the decedent, she offered to assist the decedent with his investments and the decedent agreed.  McWilliams was licensed to sell life insurance and mutual fund-based investments, and also worked as an independent contractor with Primerica.  In March 2016, she took the decedent to the registry of motor vehicles to obtain an identification card and then to his various financial institutions to close his accounts.  The decedent consolidated and transferred his funds, totaling around $450,000, to a Primerica account.  The decedent maintained a checking account and Chetwynd continued to write checks from that account which the decedent signed, including one for $5,695, which was a loan from the decedent to Chetwynd's boss.  Chetwynd served as a

guarantor on the loan, but it eventually was repaid in full by his boss.

3. <u>Will and subsequent POA</u>. In early January 2017, the decedent was admitted to the hospital and diagnosed with pneumonia and congestive heart failure. The decedent later was transferred to the Bostonian Rehab & Nursing Center (Bostonian), at Chetwynd's request because his sister worked there. Chetwynd frequently visited the decedent at the Bostonian. Chetwynd also used the decedent's debit card during this time to make purchases for both himself and the decedent.

While the decedent was at the Bostonian, Chetwynd told Attorney McWilliams that the decedent wanted to put Chetwynd in his will. McWilliams then met with the decedent alone and went over changes that the decedent wanted to make to his will. At the time, the decedent had a will that he had executed in 2012 (2012 will). Chetwynd retrieved the 2012 will from the decedent's apartment and provided a copy to McWilliams. The 2012 will nominated Attorney Leahy as personal representative of the estate. The 2012 will devised one-half of the decedent's estate to his church, the Quincy Community United Methodist Church of Wollaston (church), one-quarter to the decedent's

former spouse (who had since passed away), one-eighth to the Salvation Army, and one-eighth to the Madores.[5]

On January 30, 2017, the decedent executed the will at issue in his room at the Bostonian and in the presence of two witnesses and Attorney McWilliams.  The will devised $1,000 to the church and the decedent's currency collection, vehicles, and real estate, if any, to Chetwynd.  After those distributions, one-quarter of the remainder of the estate was left to the Madores and three-quarters to Chetwynd.  The will also appointed Chetwynd as personal representative of the estate.  On the same day, the decedent executed another springing durable power of attorney (2017 POA) that was identical to the 2016 POA. Chetwynd brought the decedent's checkbook to the Bostonian that day; the decedent did not fill out but did sign the check for McWilliams's services.  McWilliams provided Chetwynd with electronic copies of the will and the 2017 POA, but Chetwynd did not tell the Madores that the decedent had executed a new will at that time.

---

[5] The decedent also executed two earlier wills, in 2011 and 2012, that also nominated Attorney Leahy as executor.  The 2011 will devised all of the decedent's property to the Quincy Memorial Church of Wollaston.  The prior 2012 will included the same bequests as the subsequent 2012 will except that the bequest to the church was limited to use for maintenance, care, repair, and improvement of its building and grounds.

4. Decedent's care. The decedent was discharged from the Bostonian in February 2017, and required twenty-four hour care. This care was provided by Chetwynd, his sister,[6] his girlfriend, and healthcare aides from an agency. The caregivers were paid using the decedent's funds, with Chetwynd's sister and girlfriend, who had no recent home healthcare experience, receiving the same hourly rate as the healthcare aides. Chetwynd was not paid for providing care but needed a place to stay and lived with the decedent without paying rent or contributing to utilities for a period of time.[7] During this time, Chetwynd used the decedent's debit card to purchase furniture for the apartment.[8] Chetwynd also used his authority under the POAs to replace a rug in the decedent's apartment, even though he never received a written certification from a doctor that the decedent was incapable of attending to his finances.

---

[6] A different sister than the one who worked at the Bostonian.

[7] Chetwynd was going through a divorce at the time and had moved out of his marital home.

[8] Chetwynd also installed video cameras in the decedent's apartment. At one point, Chetwynd confronted an employee of the apartment complex after learning from video footage that she had asked the decedent whether he ever was repaid for the loan to Chetwynd's boss.

9

Chetwynd eventually moved out of the decedent's apartment and into an apartment owned by a friend. The decedent's health continued to decline and he again was admitted to the hospital followed by another stay at the Bostonian. The decedent returned to his apartment, where he began to receive hospice care in addition to twenty-four hour care. Chetwynd did not inform the Madores that the decedent was receiving hospice care.

Thereafter, while the decedent was receiving hospice care, Chetwynd set up online transfers between the decedent's investment account and the decedent's checking account in order to pay for the decedent's expenses. Chetwynd also requested that Attorney McWilliams prepare a personal loan agreement for him to borrow money from the decedent to establish a new automotive business. McWilliams never reviewed that agreement with the decedent, but the decedent and Chetwynd executed the loan agreement in August 2017. Pursuant to the loan agreement, Chetwynd borrowed $40,000 from the decedent; the note became payable on January 1, 2019, and bore an interest rate of less than one percent. Chetwynd never repaid the decedent or his estate for that loan.

While in hospice care, the decedent moved into Chetwynd's apartment from late September 2017 until his death that December. After the decedent moved in, Chetwynd's landlord (and

10

friend) increased the monthly rent from $800 to $2,000.[9] Chetwynd paid that monthly rent with checks from the decedent's checking account that Chetwynd signed as "POA."

A month before the decedent passed away, the Madores asked Chetwynd about the decedent's expenses and estate plan. Chetwynd informed David that the decedent had changed his estate plan and stated that David was "in the will." Chetwynd did not tell the Madores that Chetwynd was the primary beneficiary of the will or that he recently had borrowed $40,000 from the decedent. During this conversation, David learned that the decedent's cost of care was $4,000 per month. This information concerned David because the decedent always had been frugal and David previously understood that the decedent was receiving care at no cost.

5. _Present action_. The decedent passed away on December 2, 2017. The following month, Chetwynd filed a petition for formal probate of the 2017 will. Donna filed a notice of appearance and objection supported by an affidavit. A seven-day trial ensued. At the beginning of the sixth day of trial, the judge announced her finding that Chetwynd bore the burden of proving that the will was not the product of undue influence because Chetwynd was in a fiduciary relationship with the

---

[9] Chetwynd was unemployed at the time because the car care center recently had closed.

11

decedent at the time the will was executed.  After the trial, the judge issued detailed findings of fact and conclusions of law.  The judge explained that the 2016 POA created a fiduciary relationship such that Chetwynd bore the burden of proof, and ultimately found that the will was the product of undue influence.  A decree entered denying Chetwynd's petition for formal probate of the will.  This appeal followed.

Discussion.  "[W]e do not set aside a judge's findings of fact unless they are plainly wrong . . . or clearly erroneous" (quotations omitted).  Rood v. Newberg, 48 Mass. App. Ct. 185, 190 (1999).  "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation omitted).  Matter of the Estate of Moretti, 69 Mass. App. Ct. 642, 651 (2007).

> "In applying this standard, the judge's assessment of the quality of the testimony is entitled to our considerable respect because it is the trial judge who, by virtue of [her] firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence" (quotation omitted).

Id.

Chetwynd challenges the judge's allocation of the burden of proof on the issue of undue influence as well as the sufficiency

12

of the evidence supporting the finding of undue influence.  We discuss each in turn.

1.  Burden of proof.  The party contesting the validity of a will ordinarily bears the burden of proving undue influence.  See Rempelakis v. Russell, 65 Mass. App. Ct. 557, 563 (2006).  "However, in cases involving a fiduciary, the fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations" (quotation omitted).  Matter of the Estate of Urban, 102 Mass. App. Ct. 284, 290 (2023).  A fiduciary must prove the absence of undue influence only where he has taken part in the transaction at issue.  See id.

"Although some fiduciary relationships, such as that between guardian and ward, are created by law, others arise from the nature of the parties' interactions" (quotation omitted).  Germain v. Girard, 72 Mass. App. Ct. 409, 413 (2008).  "Where the fiduciary relationship is not one created by law, the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden" (quotation omitted).  Id.

Chetwynd argues that he was not in a fiduciary relationship with the decedent because his authority to act under the 2016 and 2017 POAs only was triggered on receipt of written certification from a physician and no such certification was

13

ever obtained.  This argument is belied by the fact that Chetwynd admitted to exercising authority under the POAs beginning in March 2017.  Although Chetwynd did not exercise that purported authority until two months <u>after</u> the will was executed, the judge was free to rely on the fact that Chetwynd treated the POA as effective without the requisite certification from a physician when deciding whether Chetwynd was a fiduciary at the time the will was executed.  For this reason, we discern no error in the judge's finding that Chetwynd was a fiduciary.[10]

Moreover, other facts support the conclusion that Chetwynd was a fiduciary.  By January 2017, the decedent had been reliant on Chetwynd for transportation for two and one-half years, Chetwynd held title to a new car paid for by the decedent, the decedent made a loan to Chetwynd's boss, Chetwynd assisted the decedent in writing checks, Chetwynd had access to and used the decedent's debit card, Chetwynd had access to the decedent's apartment and his personal documents like his 2012 will, the decedent had named Chetwynd as his healthcare proxy, and Chetwynd made the arrangements for the decedent to execute the new estate plan with Chetwynd's attorney of choice.  See <u>UBS</u>

---

[10] Given the facts of this case, we do not pass on the issue whether a springing power of attorney always creates a fiduciary relationship at the moment of execution or whether that relationship arises only after the triggering event specified in the power of attorney occurs.

Fin. Servs., Inc. v. Aliberti, 483 Mass. 396, 406 (2019) (fiduciary relationship arises where one is dependent on another's judgment in business affairs or property matters). See also Germain, 72 Mass. App. Ct. at 413 (fiduciary relationship existed where son-in-law managed decedent's household affairs and expenses for part of year, and oversaw preparation of will due to decedent's failing health). Contrast Erb v. Lee, 13 Mass. App. Ct. 120, 125 (1982) (mere fact, without more, that individual was decedent's "friend and housekeeper" insufficient to "rise to the level of a fiduciary").

Chetwynd also took part in the decedent's estate planning and benefitted from it. Chetwynd was pivotal in the decedent's execution of the 2017 will -- he selected Attorney McWilliams to handle the estate plans, told her that the decedent wanted to add Chetwynd as a beneficiary, provided her with the 2012 will, and coordinated payment for her services from the decedent's account. Chetwynd also played an important role in the decedent's financial affairs and decisions about his property, including when he was in the hospital and the Bostonian, as described above. See Matter of the Estate of Moretti, 69 Mass. App. Ct. at 652 (influence over decedent's decisions regarding property relevant to determining whether fiduciary took part in transaction). Finally, there is no doubt that Chetwynd stood to

15

benefit from the execution of the will.  The prior will left nothing to Chetwynd; he was the primary beneficiary under the new will and stood to inherit more than $250,000.  Accordingly, the judge properly allocated the burden of proof to Chetwynd.

2.  Sufficiency.  "Undue influence . . . creates a situation where the victim's own free will is destroyed or overcome such that what he does, his action, is contrary to his true desire and free will."  Howe v. Palmer, 80 Mass. App. Ct. 736, 740 (2011).

> "Four considerations are usually present in a case in which a supportable finding of undue influence has been made. These involve showings that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means."

Matter of the Estate of Moretti, 69 Mass. App. Ct. at 654-655, quoting Heinrich v. Silvernail, 23 Mass. App. Ct. 218, 223 (1986).  A fiduciary generally can meet the burden of proof by showing that the principal made the bequest with the advice of independent counsel.  See Matter of the Estate of Urban, 102 Mass. App. Ct. at 291.

a.  Independent legal counsel.  Chetwynd first argues that he satisfied his burden of proof because the decedent received independent legal advice from Attorney McWilliams prior to executing the will.  While the trial judge did not make an

16

explicit finding on the issue, the judge's subsidiary findings support the conclusion that that McWilliams did not provide independent legal counsel. See Germain, 72 Mass. App. Ct. at 413 (subsidiary facts established existence of fiduciary duty in absence of express finding). The judge found that Chetwynd chose to reach out to his own attorney contacts instead of the decedent's former estate planning attorney, Attorney Leahy, with whom the decedent had had a professional relationship since at least 2002. Notably, the judge also found that Chetwynd selected McWilliams to provide estate planning advice to the decedent because "he knew that, due to their pre-existing relationship, she would not question [Chetwynd's] representations to her regarding the [d]ecedent's desired estate plans." See Matter of the Estate of Moretti, 69 Mass. App. Ct. at 643-644 (to satisfy fiduciary's burden, "the legal representation provided must be truly independent, with the lawyer's loyalty flowing to the client testator alone").

Chetwynd was the primary person in communication with Attorney McWilliams. Indeed, he was the one who notified McWilliams that the decedent wanted to add Chetwynd as a beneficiary. Chetwynd and McWilliams also "discussed and agreed upon" the date that the will would be executed, with Chetwynd agreeing to bring the decedent's checkbook to the Bostonian to ensure McWilliams was paid that day. Moreover, despite the fact

17

that McWilliams met with the decedent alone on two occasions before the will's execution, the will included certain obvious mistakes that called into question how carefully it was reviewed with the decedent -- i.e., the decedent's last name was spelled incorrectly in the first line of the will and his town of residence was incorrect on the third page.[11]

Attorney McWilliams also engaged in other conduct that supported an inference that she did not have undivided loyalty to the decedent. She prepared the original POA in 2016 before she even met with the decedent, set up a financial relationship with the decedent such that she managed his investments, prepared an estate plan initially on Chetwynd's request, and later drafted the personal loan agreement for Chetwynd that she never reviewed with the decedent.[12] When taken together, this evidence was sufficient to show that Chetwynd intruded into the relationship between McWilliams and the decedent, such that he undermined the independence of the legal representation received with respect to the will. Contrast Matter of the Estate of Urban, 102 Mass. App. Ct. at 291.

---

[11] The judge did not credit all of McWilliams's trial testimony and McWilliams kept no notes from her meetings with the decedent.

[12] The judge expressly found that the decedent did not receive independent legal advice prior to executing the agreement to lend Chetwynd $40,000.

18

b.  Finding of undue influence.  Ample evidence was presented to support the judge's findings on all four factors of the undue influence claim.  The disposition of the majority of the estate to a person whom the decedent had known for a few years was unnatural.  Although Chetwynd had helped the decedent prior to the execution of the will, the decedent had given Chetwynd sole use of a brand new vehicle at no cost other than gas expenses in exchange for transportation assistance.  The decedent through his earlier wills had shown a desire to make a large bequest to his church.  The decedent had stopped attending church regularly by 2017, but he still regarded aspects of his faith as "important" at the time he was admitted to the Bostonian.  See Matter of the Estate of Moretti, 69 Mass. App. Ct. at 657 ("sudden and dramatic change" of estate plans in favor of new acquaintance evidence of unnatural distribution).  Contrast Heinrich, 23 Mass. App. Ct. at 224 (niece not natural object of uncle's affection where there had been virtually no communication between them for years).

The decedent also was susceptible to undue influence due to his reliance on Chetwynd for transportation and his failing health.  The decedent was in his mid- to late eighties, and his mental and physical health had declined over the three-year period that he knew Chetwynd.  By the time that the decedent executed the will, he had memory problems and dementia, and

recently had been diagnosed with pneumonia and congestive heart failure.  As a result, he had been in the hospital and in the Bostonian in the month prior.  Although the decedent was able to live alone prior to this hospital admission, he required twenty-four hour care following his discharge until he passed away.  See Heinrich, 23 Mass. App. Ct. at 223 (decedent susceptible to undue influence given age, weakened physical condition, and total dependency on others).

The findings also support the conclusion that Chetwynd had an opportunity to exercise undue influence over the decedent and used the opportunity to procure his status as the primary beneficiary under the will.  The judge found, and the record supports, that Chetwynd "gave [the Madores] carefully curated updates about the [d]ecedent, sharing health and outing related updates," without disclosing the financial benefits received by Chetwynd.  The judge also found that Chetwynd carefully documented his activities with the decedent in photographs, "to avoid arousing suspicion in the [Madores] and to defeat any future allegations that [Chetwynd] should not have been the primary beneficiary."  In his communications with the Madores, Chetwynd did not disclose the $5,000 loan to his boss, the car agreement that essentially gifted the Challenger to Chetwynd, or the plans to execute a new will naming Chetwynd as the primary beneficiary.  See Matter of the Estate of Sharis, 83 Mass. App.

20

Ct. 839, 844 (2013) ("aura of secrecy" around estate planning supported finding of undue influence).

The judge further found that Chetwynd took steps to insert himself into the decedent's life over the three years prior to the execution of the will. The decedent came to rely on Chetwynd for transportation, socialization, and advice. Once Chetwynd had gained the decedent's trust, Chetwynd contacted his own acquaintances to draft various agreements and estate planning documents for Chetwynd's own benefit. This evidence was sufficient to support the judge's finding of undue influence.

Chetwynd also argues that the judge's finding must be set aside because she improperly relied on events occurring after the execution of the will in her analysis. Of course undue influence must be operative at the time that the will is executed even if "an objective observer at the execution could detect no indication of it." Erb, 13 Mass. App. Ct. at 125. However, "[n]either direct evidence nor evidence of appropriation of assets for personal use before death was required to support an inference of undue influence" (emphasis added). Matter of the Estate of Sharis, 83 Mass. App. Ct. at 846. That Chetwynd used the decedent's assets for his own personal gain and that of his friends and family -- including the $40,000 loan that the decedent made without the benefit of

21

independent legal counsel and that has never been repaid -- supports the conclusion that undue influence was at play even in the months before that conduct. See id. at 845-846 (fiduciary preserving assets bequeathed to him after execution of will and depleting assets bequeathed to others evidence of undue influence). Even excluding Chetwynd's conduct postdating the execution of the will, Chetwynd bore the burden of proving the absence of undue influence and the judge's finding that he failed to carry that burden was not clear error.[13]

Decree entered April 13, 2020, affirmed.

By the Court (Vuono, Milkey & Hand, JJ.[14]),

Assistant Clerk

Entered: May 10, 2024.

---

[13] Donna's request for attorney's fees is denied.

[14] The panelists are listed in order of seniority.

22