PETITION FOR REVOCATION OF A DECREE FOR ADOPTION OF A MINOR.

Bristol. January 9, 1963. — April 2, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL, & REARDON, JJ.

*Adoption. Probate Court,* Findings by judge.

On appeal from a decree of a Probate Court with findings of fact and a report of the evidence, this court will review the evidence, give due weight to the findings of the trial judge, which will not be reversed unless plainly wrong, find any additional facts justified, and decide the case in accordance with its own reasoning and understanding. [669]

In a proceeding in the Probate Court by the mother of a child five years old for revocation of a decree entered shortly after the child's birth allowing a petition for her adoption by her maternal grandparents purportedly signed by the child's mother and her husband in "consent to the adoption," a decree vacating the decree for adoption and granting custody of the child to her mother was reversed and the petition for revocation was ordered dismissed in the circumstances where findings by the trial judge, that the mother was misled as to the nature of the adoption proceeding, that the attorney for the grandparents secured "through false allegations" a waiver of the statutory requirement of a year's residence by a child in the home of a petitioner for adoption before entry of a decree therefor, and that the "signatures of the . . . [mother] and her husband on the petition for adoption were forged," were shown by the evidence to be plainly wrong.   [664–665, 670–672]

PETITION filed in the Probate Court for the county of Bristol on March 29, 1961.

The case was heard by *Mullaney, J.*

*Felix F. Perrone* (*Max F. Greenstein* with him) for the respondents.

*William H. Lewis, Jr.* (*Pearl H. Mekelburg* with him) for the petitioner.

SPIEGEL, J.   This is a petition for revocation of a decree of adoption brought by the natural mother of the minor. The petitioner also seeks custody of the child.   The petition was filed on March 29, 1961.   A hearing on the petition was begun on November 20, 1961.   The probate judge entered a decree vacating the decree for adoption and ordered that the petitioner be given custody of the child, from which the respondents appealed.   The evidence is reported, and the exhibits are before us.   The judge incorporated in the decree the following findings: That "the petitioner . . . was misled at the time the adoption petition was prepared and that at no time did she consent either verbally or in writing to give up her child for adoption but believed that she was leaving the said child in the care of her parents so that if anything happened to her until she was ready to take the child, they could continue to raise the said child; and it appearing that upon requesting the child when she and her husband . . . were in a position to take the child, it was necessary for her to hire an attorney to secure the informa-

tion concerning the alleged adoption; and it appearing to the Court that at all times the petitioner . . . insisted the child know that she was the mother of the child and that she asked for the child at her earliest opportunity, and it appearing further that the respondents through their attorney hastened the hearing on the adoption and secured the waiver of the year's residence period through false allegations; and . . . that the alleged signatures of the petitioner and her husband on the petition for adoption were forged . . . .''

On February 23, 1956, a petition for adoption and change of name was filed by the parents of the natural mother seeking the adoption of a child who was born in New Bedford, Massachusetts, on January 26, 1956. The petition states that the parents of the child ''consent to the adoption'' and the document bears two signatures purporting to be those of the parents of the child. A report of the Department of Public Welfare, dated May 11, 1956, signed by a supervisor of the department was filed in the Probate Court. This report stated, among other things, that the natural mother of the minor had said that she ''signed the petition and consents'' to the adoption and that her husband ''signed the petition and as legal father consents to the adoption.'' On May 22, 1956, the same probate judge who heard the instant matter entered a decree allowing the petition for adoption and ordered the minor's name changed to that of the parents of the natural mother.

The following is a condensation of the evidence as revealed from a detailed examination of the transcript of testimony and of the exhibits. Sometime in 1955, the petitioner, while attending college, became aware of the fact that she was pregnant. She did not inform her parents about her condition until she ''went home in November.'' Her mother was educated at several colleges, holds a master's degree in Education, has thirteen credits toward a Ph.D., and is a teacher in a junior high school. She testified that her daughter told her she was pregnant and there was a conversation about the ''expected birth of this child.'' The daughter said that ''she didn't care about it, she didn't

want it . . . she didn't feel it moving and . . . hoped it was dead.'' The petitioner's mother took her to a local physician and made arrangements for the birth of the child. The petitioner had a ''private doctor,'' ''private room'' at the hospital, and ''everything she wanted,'' provided for by her parents. The child was born on January 26, 1956.

From the ''very beginning'' the petitioner's mother discussed the adoption of her daughter's child and said to her daughter, ''it is better that your father and I adopt the baby, because it is our blood; and, of course . . . [your husband] is not our blood, and if anything should happen to you the baby will be with its blood kin.'' The petitioner agreed and, as a result, arrangements were made with an attorney to draft a petition for adoption.

Subsequently the attorney appeared at the home of the petitioner's parents and the petitioner and her husband signed the petition consenting to the adoption. The attorney also ''signed'' the ''paper.''

The natural father of the child was a married man and the last time the petitioner saw him was in May of 1955. She and her husband were married on January 20, 1956. She denied that the signature purporting to consent to the adoption was hers and her husband denied that the signature on the petition was his.

The petitioner is a schoolteacher and has a son, fourteen months old. She testified that her mother had told her that she ''had signed guardianship papers so that the child's real father could not come and take . . . [the child] away.'' She claimed that she had understood that when her husband ''got out of college'' and they were ''financially able,'' they could have the child. She admitted that when she and her mother consulted the doctor he asked her ''one simple question'' as to whether she wanted the child and she ''just said, 'No.' ''

The husband testified to a conversation with his wife's father concerning his ''feelings'' for the child about to be born ''since the child was not . . . [his]'' and he agreed that his wife's parents would ''care for the child.''

The petitioner and her husband each testified that they first learned the child had been adopted shortly after Christmas, in 1958, through the "investigation of a lawyer" in Connecticut whom they had retained. They subsequently retained a lawyer in Massachusetts who in turn referred them to their present attorney.

A "handwriting and document expert" testified that in her opinion the petitioner and her husband did not sign the petition consenting to the adoption and that the signatures were forgeries. This opinion was based on a comparison of certain "standards" of signatures of the petitioner and her husband written sometime in 1960 with those appearing on the petition for adoption.

The expert testified at some length as to the characteristics of the "genuine" signatures and the differences between those and the signatures appearing on the adoption petition. It was her opinion that the signature of the petitioner was "a slowly made drawn copy," and the signature of her husband was "a slowly drawn, carefully made, hesitatingly conceived copy of . . . [his] signature." She defined a "forged signature" as a "carefully made copy, sometimes a tracery, of a genuine signature. It is similitude of somebody's known writing." She also testified that the petitioner "signs" her middle name with one "n" in all the "standards" she had seen whereas on the adoption petition the middle name is written with a double "n." Her opinion was not based on this fact.

The attorney who drafted the petition testified that he had known the parents of the petitioner "since about 1940," and that he also had known their children. He drew the petition for adoption in his office from a "birth certificate . . . furnished" him, because he wanted to be sure he was "getting the correct names." The birth certificate shows the middle name spelled with two "n's." On February 8, 1956, he visited the home of the petitioner's parents. All of the parties signed the petition in his presence. Before the petitioner signed he said to her " [h]ere is a petition for the adoption of your youngster by your mother and father.

Now, you know what it is all about, don't you? Are you agreeable that they adopt the youngster?" She answered, "Yes, it is all right." The attorney also told the petitioner's husband the "substance" of the petition and where to sign it.

Prior to the allowance by the probate judge of the petition for adoption there was an investigation made by the Massachusetts Department of Public Welfare. The investigator testified that she had been employed as a social worker in the Division of Child Guardianship since 1946 and as such she is called upon to make investigations for the department relative to the adoption of minor children. "[S]ometime in 1956" she made an investigation regarding the petition for adoption with which we are here concerned. While testifying, she referred to her "original notes made at the time." The investigator visited the home of the petitioner's parents, and at that time the petitioner was living there. She talked to the petitioner's parents, to the petitioner, and to her husband. The petitioner gave the investigator detailed information regarding the pertinent facts. In response to questions by the investigator the petitioner and her husband said they had signed the petition consenting to the adoption of the child.

A sister of the petitioner testified to a conversation in which she was told by the petitioner that her "mother and father were going to adopt the baby." The sister also testified that the handwriting on the petition for adoption was her sister's. She heard the conversation among her sister, her sister's husband and the investigator and heard the petitioner and her husband say they had signed the petition consenting to the adoption.

The respondents introduced in evidence an "old" envelope, on the reverse side of which the petitioner's first and middle initials and her maiden surname in full were written by her.

The respondents, in their brief, argue at considerable length that the standards used by the expert and admitted in evidence, relating to the "authenticity" of the signa-

tures, were "duly objected to" and were inadmissible.    We do not consider this contention, for the record is clear that no objection was made at the time the standards were admitted in evidence.

It is our obligation to review the evidence and reach a decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong, and finding for ourselves any additional facts we believe to be justified by the evidence.  *Berry* v. *Kyes,* 304 Mass. 56, 57–58.    *Shattuck* v. *Wood Memorial Home, Inc.* 319 Mass. 444, 445.    *Young* v. *Paquette,* 341 Mass. 67, 70. *Hanrihan* v. *Hanrihan,* 342 Mass. 559, 564.

The standards were written some four years after the petition for adoption had been allowed by the probate judge and were written for the sole purpose of enabling the handwriting expert to testify in these proceedings.    The "expert" displayed the signatures on the adoption petition and the standards by an enlargement approximately twice the size of the original.    It is obvious to us that the standards are meticulously, deliberately, and painstakingly written. Each letter is clear and distinct and the spaces between the first and middle names and the middle names and the surnames are equally distant.    It is quite apparent that the standards are not representative of the manner in which the petitioner and her husband ordinarily sign their names. More than incidental, however, is the signature of the petitioner on the back of the envelope which is in evidence. This signature is of the petitioner's maiden name and therefore, we assume, was written prior to her marriage in 1956. It appears to us that this writing bears no resemblance to the writing of the petitioner as shown on the standards used by the expert in forming her opinion.

Although the expert testified that the two "n's" appearing in the middle name of the petitioner on the adoption petition did not cause her to conclude that the signature was a forgery, nevertheless she asserted "it is most unusual for an American trained person to misspell his name . . . it is

most unusual to leave out a necessary letter in the middle of a word.'' The expert did not refer to the birth certificate which showed the middle name of the petitioner spelled with two ''n's'' or to the typewritten portion of the adoption petition wherein the middle name of the petitioner is also spelled with two ''n's.'' This, in itself, may have accounted for the petitioner signing her middle name with two ''n's.'' It should be noted, too, that in the petition for revocation filed by the petitioner the typewritten portion likewise shows the middle name spelled with two ''n's.'' It seems reasonable to suppose that if the expert's opinion is sound to the effect that the signature of the petitioner appearing on the petition for adoption was a ''copy'' of the petitioner's ''genuine'' signature, then the middle name of the petitioner must also have been spelled with two ''n's'' in the ''genuine'' signature from which the alleged forgery was copied.

The only completely objective witness who testified in the instant proceeding was the investigator employed by the Department of Public Welfare. Even though her testimony is not to be considered sacrosanct, it is difficult to conceive of a motive to prompt her to falsify her testimony. A vigorous, intense cross-examination by counsel for the petitioner in no way altered the positiveness of her statements. We believe she was telling the truth. To reach a contrary result we would have to conclude that an apparently respectable and experienced member of the bar, the investigator for the Department of Public Welfare, and the parents of the petitioner were perpetrating an outrageous fraud upon the probate judge. However, our decision does not rest solely on the above reasoning.

The petitioner and her husband, if their testimony is to be believed, first learned of the adoption about Christmas of 1958. They thereupon retained an attorney, but this petition for revocation was not filed until March 29, 1961. This is of substantial significance, particularly when we consider the provisions of G. L. c. 210, § 11, under which a parent who had no personal notice of the proceedings upon

a petition for adoption before the entry of a decree may appeal to this court within one year after actual notice thereof.

We also observe that, although, at the time of the hearing, the minor was almost six years of age, there is nothing in the record to indicate that the petitioner or her husband contributed anything to the support of the child. We do not underestimate the love which the mother undoubtedly has for the child. However, it was not the kind of affection which manifested itself directly after the birth of the child nor, indeed, for some time thereafter. The petitioner is not an uneducated person. She has a college degree and teaches school. It is an arduous task to reconcile her testimony that she "signed guardianship papers," with her denial of the signature on the adoption petition. We assume that the point of her testimony was that she "signed" a document consenting to guardianship of her child but not to adoption. It does not seem likely that the petitioner's mother would have needed the petitioner's signature on a guardianship petition for the purpose of having the signature copied. It is curious, too, that no questions were asked as to the disposition of the alleged guardianship petition which the petitioner admitted signing. It is difficult to conclude that she was not fully aware of the legal proceedings which resulted in her parents' adoption of the child. As for the husband of the petitioner, he seems to have had little, if any, feeling regarding the child.

It is true that in the instant matter the precise legal issue does not involve the welfare of the child. Nevertheless, we cannot ignore its importance (see *Adoption of a Minor,* 343 Mass. 292, 294–295), nor can we remain unmindful of the position of the grandparents. They took care of a situation, not of their making, with tact and understanding. From the day of the child's birth, they have given her the love and protection which she needed. The petitioner has at all times been able to visit with the adopted child who knows that the petitioner is her mother. This would hardly have been the situation if a couple other than the grandparents had adopted the child.

From the foregoing analysis and evaluation of the testimony and our examination of the exhibits, we are constrained to find that the petitioner and her husband did sign the petition for adoption, that the attorney did not secure "the waiver of the year's residence period through false allegations," and that the judge was plainly wrong in finding to the contrary.

Accordingly, the decree is reversed and a new decree is to be entered dismissing the petition.

*So ordered.*