JULIE HEINRICH vs. MARVIN SILVERNAIL & another.[1]

Berkshire. October 17, 1986. — December 3, 1986.

Present: GREANEY, C.J., QUIRICO, & ARMSTRONG, JJ.

*Will*, Validity, Undue influence. *Social Worker. Practice, Civil,* Findings
   by judge.

A Probate Court judge had insufficient basis for concluding that a decedent's
   purported will had been procured by the beneficiary's exercise of undue
   influence over the decedent in violation of a confidential relationship
   arising out of her position as a licensed social worker, where, at the
   hearing on a petition for probate of the will, the evidence showed that
   the will represented deliberate consideration by the decedent, that it was
   executed openly after the decedent had received independent legal advice,
   that the beneficiary did not actively secure the drafting of the will, that
   the decedent lived a sufficient time to permit a change in the will if he
   had desired it, that the will did not alter any prior testamentary plan,
   and that its provisions were not unnatural in terms of the decedent's
   circumstances, attitudes, and family. [223-230]

PETITION filed in the Berkshire Division of the Probate and
Family Court Department on February 16, 1982.

The case was heard by *Andrea F. Nuciforo,* J.

*Frank E. Antonucci* for the proponent.

*Paul Greene* for Marvin Silvernail.

*Jessie Doyle Deely* for Marion S. Gregg.

GREANEY, C.J. This is an appeal by Julie Heinrich from a
decision disallowing her petition for probate of an instrument
purporting to be the will of Ernest W. Silvernail (decedent).[2]
The document left substantially all the decedent's estate to

---

[1] Marion S. Gregg.

[2] The docket does not show the entry of a decree, as is required. We treat
the judge's decision, which in effect directs the entry of a decree, as appeal-
able. See *Lewis* v. *Emerson,* 391 Mass. 517, 519-520 (1984); *Swampscott
Educ. Assn.* v. *Swampscott,* 391 Mass. 864, 865-866 (1984).

Heinrich and named her as executrix. The decedent's brother, Marvin Silvernail, and his niece, Marion S. Gregg, who would take equally in the event of intestacy, see G. L. c. 190, § 3(5), opposed the petition. A judge of the Probate and Family Court concluded that the decedent had testamentary capacity when the will was executed. He found, however, that the will should be disallowed because it was procured by Heinrich's exercise of undue influence over the decedent in violation of a confidential relationship arising out of her position as a licensed social worker. Heinrich argues that there was insufficient evidence to support this conclusion. We agree and order the will admitted to probate.

The facts, as taken from the judge's findings with some supplementation from the record, are as follows. When the decedent was four months old, his family moved to a farm in West Stockbridge where he resided until his final illness. During his late teens or early twenties, the decedent was crippled in an accident on the farm. Later he suffered from polio. The decedent never married and remained on the farm for some sixty years with his unmarried brother, Marvin, who is described in the judge's findings as "a shy and simple person." The life of the two brothers was uncomplicated, and, until the decedent could no longer do his daily chores, confined principally to management of the farm.

On May 13, 1980, the decedent was hospitalized and diagnosed as suffering from primary cancer of the prostate. The cancer required serious and intrusive surgery and eventually metastasized to his bones. He was ultimately diagnosed as terminally ill.

On July 17, 1980, the decedent, then seventy-six years of age, was transferred from the hospital to a nursing home in Great Barrington. The decedent knew that he was dying and that he would live out his final months or years at the home. At the time of admission, the decedent came in contact with Heinrich, a licensed social worker, whose duties included responsibility for the admission process. In this capacity, she reviewed the decedent's medical and social background to assist him in becoming acclimated to his new environment.

At the home, some special arrangements were made for the decedent. Unable to walk since 1973, and hampered by a catheter, he was transported by means of a special chair. The device, which had to be pushed by others, moved the decedent about in a semi-sitting position. He shared a room with another patient. He had a radio but no television set or telephone. The few telephone calls he did make were made to his brother and were handled at his request by nursing home personnel.

Within a short time, a strong mutual attachment developed between Heinrich, then twenty-nine, and the decedent. She was aware of his life history and testified that his isolated past made it harder for him to adjust. In order to facilitate that adjustment, she visited him almost every day. At his request, she took charge of his bank accounts and his checkbook. This task involved collecting and depositing his social security payments as well as preparing checks for him to sign to pay his bills.

As the relationship deepened, the decedent indicated that he "loved" Heinrich, told her that she reminded him of a female friend from his past, and expressed the hope that they would meet in heaven. For her part, Heinrich wrote in the decedent's record that he was "the most inspirational man I have ever met." She discovered that the decedent had over a sixty-year period written numerous poems. She collected his poems and had them distributed in a monograph entitled "Poetic Thoughts — poetry written from 1921-1981 by Ernest Silvernail."[3] On one Christmas and on one of her birthdays, the decedent gave her small gifts of cash.[4]

The decedent had never made a will. In October, 1980, the decedent furnished Heinrich with the name of his lawyer and asked her to make an appointment for him to discuss a will. She did so. Later that week, the decedent told her that he had decided to leave her his farm. Heinrich testified that she con-

---

[3] The decedent had written at least one of the poems specifically for Heinrich.

[4] She testified that she endorsed the birthday check over to the United Way and that she insisted that the decedent give the money earmarked for her Christmas present directly to the United Way. His check register, which was in evidence, shows the birthday check to her, and two others to the United Way. The endorsed check was not in evidence.

sidered it improper for her to accept such a gift and that the decedent had expressed personal reasons for not wanting to leave the farm to his brother or to his niece. She also testified that the decedent indicated to her that he wanted to do something worthwhile with his property, so she brought him a pamphlet entitled "Wise Giving Guide," which provides assistance to someone contemplating a charitable gift. Having indicated that she could not take the farm, Heinrich made contact with the decedent's attorney and cancelled the appointment until the decedent decided upon another testamentary plan.

Heinrich testified further that in the fall of 1980 she began to feel the effects of "burnout." On January 28, 1981, she permanently left her employment at the nursing home. For about a week thereafter, the decedent became depressed, and his physical and mental condition deteriorated seriously. Soon, however, Heinrich began visiting him again on a regular basis. His spirits and physical condition rapidly improved. Before quitting, Heinrich had talked with her supervisor about how best to terminate her relationship with the decedent. Later, she also consulted with her supervisor on how to make the decedent understand the difference between their professional relationship and the close friendship they were developing.

Throughout the entire period that Heinrich knew the decedent, she was involved with a male friend, also a social worker. The pair had been living together, on and off, for approximately ten years. When she first met the decedent, she was living alone in an apartment in Great Barrington. However, at some point during the decedent's stay at the nursing home, she and her friend moved into a house purchased by her friend's father, who held title to the house and furnished blank checks for the couple's use.

After Heinrich left the nursing home and after she began visiting the decedent, he asked the bookkeeper at the home to call his lawyer. (The bookkeeper had taken over assisting the decedent with his checkbook when Heinrich left.) The bookkeeper made the appointment. When the lawyer came to the home, the decedent met with him alone and told the lawyer to leave everything to Heinrich except for a life estate for his

brother in the farm buildings Marvin had been living in. When questioned by the lawyer on why so much was being given to Heinrich, who was not a relative, the decedent replied that she was his best friend.

It appears that the decedent's only relatives were his brother, Marvin, and his niece, Gregg.[5] Marvin is either perceived as, or is, unable to deal with matters which are at all complex. It also appears that their father, whose will was drawn by the decedent's lawyer's father, gave the farm and most of his property to the decedent, along with some money in trust for Marvin on an apparently informal understanding that Marvin could live and work on the farm as long as he wanted. Gregg is the daughter of Arthur Silvernail, another brother of the decedent. The decedent and Arthur had quarreled when young and Arthur had been "thrown off" the farm. The decedent and Gregg met, if at all, when she was very young, and there had been little communication between them after that, including throughout his final illness.

On May 12, 1981, the lawyer returned to the nursing home with the will and again met with the decedent. The decedent read the document through and agreed that it comported with his wishes. With the bookkeeper and his attorney as witnesses, he then executed the will. It left everything to Heinrich subject to a life estate in Marvin "in the building on that part of my farm . . . in West Stockbridge . . . that he presently occupies as his dwelling house, and the adjoining barn."[6] Heinrich was not present at the first meeting between counsel and the decedent or at the execution of the will. On February 5, 1982, Silvernail died.

The judge made the following rulings with respect to the validity of the will: "The dispositive portions of the will . . . were procured by the undue influence exerted by the main bene-

---

[5] There is some vague mention in the record of a "cousin," but he is never described as a relative or heir at law.

[6] According to the inventory filed by the special administrator appointed to handle the estate pending final disposition of this litigation, the personal estate has a value of $14,515.07, and the land and building comprising the farm have a total value of $127,200.

ficiary under the will. In addition, [the] dispositive portions were induced in direct violation of the obligations, duties and ethics that were owed by a licensed certified social worker who had been entrusted with the care of a patient confined to a nursing home . . . ." Based on these rulings, the judge concluded that the petition seeking to admit the will to probate should be disallowed. We examine this decision under the standard for the review of cases on the probate side of the Probate and Family Court. " 'It is our obligation to review the evidence and reach a decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong, and finding for ourselves any additional facts we believe to be justified by the evidence.' " *Olsson* v. *Waite,* 373 Mass. 517, 520 (1977), quoting from *Petition for Revocation of a Decree for Adoption of a Minor,* 345 Mass. 663, 669 (1963). See also *Erb* v. *Lee,* 13 Mass. App. Ct. 120, 124 (1982).

The legal principles constituting the law of undue influence have been discussed in numerous decisions. The leading decision, *Neill* v. *Brackett,* 234 Mass. 367 (1920), contains the most extensive discussion of the subject. That discussion need not be repeated here, except to point out that undue influence involves some form of compulsion which coerces a person into doing something he does not want to do. Four considerations are usually present in a case in which a supportable finding of undue influence has been made. These involve showings that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.

The judge had adequate basis in the evidence for finding (as he did) that the decedent, because of his age, weakened physical condition, and total dependency on others, was susceptible to undue influence. See *Raposa* v. *Oliveira,* 247 Mass. 188, 190 (1924). There was also adequate basis for finding that Heinrich had the opportunity to exert undue influence. See

*Wellman* v. *Carter,* 286 Mass. 237, 249 (1934). What is lacking in the evidence, however, is adequate proof of the causation requirement of the analysis. That is, there is insufficient evidence to justify an inference that Heinrich improperly influenced the decedent in order to procure the will. See *O'Brien* v. *Wellesley College,* 346 Mass. 162, 172 (1963); *New England Merchants Natl. Bank* v. *Mahoney,* 356 Mass. 654, 657 (1970).

First of all, the will does not reflect a disposition that ignores the natural objects of the decedent's bounty. Cf. *Popko* v. *Janik,* 341 Mass. 212, 215 (1960). The mere fact that the decedent chose to leave his property to a close friend rather than to a relative does not render the disposition unnatural. There is no rule that prefers bequests to relatives over bequests to nonrelatives who are friends. In this case, the decedent's father had left him the farm and had arranged for Marvin to stay there for his lifetime. This was in effect the same plan that the decedent perpetuated by his will. Marion S. Gregg, the decedent's niece, was omitted from the will entirely. Based on the facts set forth above, this is not surprising, let alone unnatural. She had no claim on her uncle's affection. Indeed, there had been virtually no communication between Gregg and the decedent during his final illness, and probably for years before that.[7] It also appears that on perhaps two occasions it was suggested to the decedent that he might leave his property to relatives, and he refused. As his first and only will, the document was not contrary to any prior scheme or stated intent. See *Erb* v. *Lee,* 13 Mass. App. Ct. at 122-123. In sum, the will appears completely consistent with the decedent's feelings about his niece and the arrangement originally contemplated by his father for Marvin.

The judge placed weight on the professional nature of the relationship between Heinrich and the decedent. His findings indicate that he was concerned with the fact that Heinrich may not have disclosed to the decedent that she was living with a male friend in comfortable surroundings and that she may not

_____

[7] Gregg was not called to testify at the trial. The petition for probate lists her as living in Hendersonville, North Carolina.

have told her superiors at the nursing home about the decedent's wishes. The judge also appears to have accepted the testimony of Michael Karp, a social worker and Heinrich's supervisor, that it is unethical for a social worker to accept substantial gifts from a client and, as a result, that a social worker is precluded from taking any such gift even if the gift is made by will after the professional relationship has ended.

We accept the judge's finding that the close contact between Heinrich, as a social worker, and the decedent, as her client, gave rise to a confidential relationship.[8] See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 444 (1980). We also are cognizant of the rule that when a testator and the beneficiary of a will have been in a confidential relationship it generally takes less to establish undue influence on the part of beneficiary. See *Doggett* v. *Morse,* 299 Mass. 383, 389 (1938).

We are not persuaded, however, that the factors that concerned the judge warrant a finding that undue influence was exercised by Heinrich, within the context of a confidential relationship, to procure the drawing of the will. Specifically, we attach no great significance to the fact that the decedent may have been unaware of Heinrich's male friend. Heinrich and the decedent were not involved in a relationship in which jealousy could be thought to play an active role. The decedent was in the nursing home to die, and he knew it. The favors provided by Heinrich were of the type done by friends for friends, not of a more intimate nature that might be present in

---

[8] We do not agree with the argument made by Gregg's counsel that the relationship became a fiduciary relationship by reason of the provisions of G. L. c. 112, § 131, which require social workers to conduct their activities in accordance with generally accepted professional standards. The relationship did not manifest the relinquishment of control over financial affairs, the conferral of wise authority to act on important matters and make discretionary judgments, or the degree of reliance that usually lie at the core of recognized fiduciary relationships such as attorney and client, trustee and beneficiary, guardian and ward, principal and agent, and partner and copartner. Even the relationship of attorney and client does not give rise to a presumption of undue influence in cases in which the attorney is given a bequest. See *Wellman* v. *Carter,* 286 Mass. 237, 248 (1934); *Mooney* v. *McKenzie,* 324 Mass. 685, 688 (1949).

an undue influence case in which a competing emotional relationship has been kept secret. Nor do we find convincing evidence that the decedent would not have left Heinrich his farm had he known that she had an adequate living arrangement. From all that appears, the will was motivated solely by the decedent's love and affection for Heinrich and not by the need to maintain her affection or provide her with a home.

We agree that it would have been better had Heinrich disclosed the decedent's plans to her supervisor. To some extent, this concern is lessened because the decedent told the bookkeeper the contents of the will, see note 11, *infra*. At the time the will was drawn, however, Heinrich was no longer in the employ of the nursing home.[9] Further, Michael Karp, her supervisor, testified that at the time Heinrich left she had successfully explained to the decedent the difference between their past professional relationship and their continuing friendship. We note that the will was drawn and executed several months after Heinrich had left a position that might have led to a perception by the decedent that she wielded great power over him. That she still had the power of influence held by one friend over another will not defeat the will. Such influence is a simple and expected consequence of human friendship and, in this case, compassion.

Karp's testimony about the ethical obligations of a social worker is also not decisive. There were introduced in evidence the codes of ethics governing social workers promulgated by the Massachusetts Board of Registration of Social Workers, see 258 Code Mass. Regs. § 20.02 (1980), and by the National Association of Social Workers. Neither code contains any provision that categorically prohibits the receipt of gifts by social workers from their clients. Both focus on the behavior of social workers and provide, in general terms, that social workers should not exploit professional relationships for personal gain.

---

[9] Heinrich learned of the will within days of its execution, when the decedent presented it to her.

With respect to the issue before us, these restrictions prohibit a social worker from exercising undue influence aimed at acquiring property. As to this precise problem, however, Karp testified that Heinrich handled her relationship with the decedent appropriately, that any "influence" she had on him was entirely positive, that he (Karp) never observed her attempt "negatively [to] influence, manipulate or cajole [the decedent] in any way", and that the decedent was strong-willed and able to assess and act on his own needs. Karp also testified that he observed no unethical conduct on Heinrich's part for personal gain, that she handled the termination of the professional relationship properly (and, as has been noted, in a way that allowed the decedent to understand the difference between that relationship and their later friendship), and that Heinrich acted throughout with integrity as a social worker.[10]

We can discern no proof that Heinrich manipulated her relationship with the decedent to destroy his free agency. There is nothing wrong with providing aid and comfort to a failing person; indeed, such activity is warmly human and was part of Heinrich's job. The fact that the decedent may have had property that he might devise does not alone provide a basis for discrediting her motives or inferring the existence of undue influence. From what we can discern, the relationship between the decedent and Heinrich appears to have arisen and matured naturally. The decedent's treating physician described the relationship as similar to the love shared between a grandfather and granddaughter. That physician, who saw the decedent on a regular basis, also expressed opinions that the decedent's

---

[10] The judge may have taken Karp's testimony as stating a rule of ethics that any bequest in a will by a client to his former social worker is automatically void and, as a result, that the will containing such a bequest cannot be admitted to probate. That would have constituted error. The only question before the court was whether the will had been procured by undue influence. Whether Heinrich had exercised such influence in breach of a confidential relationship was a material issue, and the ethical standards pertaining to such a relationship had relevance to that issue. A conclusion that no undue influence was exercised within the social worker relationship ends the inquiry on the only question before the court. The same conclusion pertains to the policy of the nursing home that employees cannot accept gifts.

relationship with Heinrich had considerable therapeutic value for him; that, despite his physical incapacity and terminal situation, the decedent was alert, intelligent and responsible; and that prior to and at the time he made the will the decedent knew what he wanted and what he was doing.[11]

Further, the decedent had independent counsel. See *Barnum v. Fay,* 320 Mass. 177, 181 (1946). The decedent chose his own lawyer, one whose father had drawn the decedent's father's will. Not only did Heinrich not select this lawyer, but it appears that she did not know that the will had been drawn and executed until after the fact, and she and the lawyer did not meet until after the decedent's death. The decedent met with the lawyer alone and described, without prompting, what he wished done with his property. As the lawyer put it, when the decedent provided him with his wishes as to the dispositive provisions of the will, "he spoke like a man that knew what he wanted." Moreover, the decedent lived for some nine months after the will had been drawn, without expressing any dissatisfaction with its provisions, or attempting to revoke it, although his counsel had told him how revocation could be accomplished.[12]

In addition to the above, we also perceive error in certain findings made by the judge that were important to his conclusion that undue influence had been proved. The judge found

---

[11] These views were corroborated by the bookkeeper and another social worker. The bookkeeper, who had contact with the decedent at the home and who witnessed the will, testified that he told her what was in the will. She indicated that she found him to be always articulate and clear in his thoughts and that he was also a very definite individual. The other social worker, who also saw the decedent frequently, testified that she detected no dependency on Heinrich. She also indicated that the decedent never displayed any signs of senility, and she described him as a man who could not be easily led.

[12] The contestants argue that the decedent could not have revoked the will by physical act because Heinrich possessed his copy. (The original was retained by counsel.) However, the uncontradicted evidence was that the decedent gave her the copy of the will of his own volition and at his suggestion. Further, he had been instructed by his counsel that a subsequent will would revoke this will, and yet he never attempted to prepare one.

that the decedent "was seldom seen by anyone" and placed in a position in the nursing home where he "was effectively cut apart from others." The evidence, however, was that the decedent had frequent contact with nurses and others and that he left his room almost every day. The judge further found that the decedent "suffered some delusion and moments of irrationality." The treating physician's testimony was directly to the contrary and the medical records, while indicating that the decedent was frequently medicated for pain and sometimes appeared confused, disclose nothing which would support a conclusion that the decedent lacked sufficient mental acuity to make independent decisions on important matters.

The judge also placed emphasis on Heinrich's management of the decedent's bank accounts and checkbook, concluding that "[s]he took over [his] financial affairs in a fashion that she had not done for any other patient." The latter statement is true as a general proposition, but the unfavorable characterization given to the arrangement is not accurate. After Heinrich's leaving her employment the decedent's financial affairs were handled with his assent by the bookkeeper at the nursing home. Heinrich did nothing with his savings accounts except to close out, at his request, one account. All checks were drawn at his direction, solely to pay bills, and reviewed and signed by him. Heinrich had no discretion in this area. Her duties were, like the duties of the bookkeeper who handled the task afterwards, essentially those of a clerk.

We recognize that a finding of undue influence often depends on circumstantial proof because acts which are meant to overmaster someone's free will are often done furtively. We have given deference to the judge's ability to appraise and weigh the oral testimony before him. Suspicion, however, no matter how strong, will not warrant a finding of undue influence. *Neill* v. *Brackett,* 234 Mass. at 370. "There must be a solid foundation of established facts upon which to rest an inference of its existence." *Ibid.* Such a foundation is not present here. Rather, the evidence shows (a) that the will represented deliberate consideration by the decedent, (b) that it was executed openly after the benefit of independent legal advice, (c) that the

beneficiary did not actively secure the drafting, (d) that the decedent lived a sufficient time to permit a change in the will if he desired it, (e) that the will did not alter any prior testamentary plan, and (f) that its provisions were not unnatural in view of the decedent's circumstances, attitudes and family. See 7 Powell, Real Property par. 948, at 404-406 (Rohan rev. ed. 1984). We conclude that it has not been shown that Heinrich used her position of confidence to coerce the decedent into leaving her his property. This conclusion renders it unnecessary to consider the other issues argued on appeal.

The order for decree is reversed. A decree is to be entered allowing the petition for probate of the will of Ernest W. Silvernail.

*So ordered.*