Connon, Richard F., J.

*329
INTRODUCTION

This is an action brought by the children of Joseph F. Heniy to set aside an amendment to his trust. In their complaint, they have alleged that the amendment was a forgery, or in the alternative that when their father signed the instrument that he was incapacitated or was under duress or unduly influenced.

BACKGROUND

The defendant Jeanne S. Heniy is the third wife of Joseph F. Heniy, having married Joseph in 2001. Joseph F. Heniy’s second marriage had been to Maiy, whom he married in 1990. Maiy passed away in 1995. Joseph F. Heniy’s first wife and mother of the plaintiffs was Elizabeth who died in 1988, after 56 years of marriage. When Joseph F. Heniy passed away on March 5th, 2006, he was 88 years old.
After Jeanne was married to Joseph, she sold her condominium and the proceeds went to purchase a condominium at Southport on Cape Cod, which they held under the name J&J Nominee Trust. Jeanne held a 50 percent beneficial interest and Joseph F. Heniy Trust held the other half. The Joseph F. Heniy Trust Restatement was established on October 20th, 2004. When established, Jeanne Henry would have received $50,000 from Joseph’s estate in addition to other bequests. The rest, residue and remainder would pass to the plaintiffs. The condominium at Southport would pass to Jeanne in the form of a life estate and upon her death Joseph’s 50 percent interest would pass to the plaintiffs.
Joseph F. Henry’s attorney was a Peter Conathan, who had practice in the area of estate planning as well as estate administration. He first met Joseph F. Heniy in 1996, during the process of preparing Joseph’s estate plan.
On December 30th of 2005, Joseph Henry telephoned Attorney Conathan and told him that he wanted to change his estate plan so that his 50 percent interest in Southport condominium would go to Jeanne outright. This would have eliminated the life estate. An appointment was made and Jeanne drove Joseph to Attorney Conathan’s office. Jeanne was not part of the meeting where Joseph discussed his estate plan with Attorney Conathan as she waited in the lobby. Joseph was lucid and confident at the meeting and was sure of what he wanted to do. In his conversation with Attorney Conathan, he said that his son Jack had been good to him lately, and that his daughter Maiy seems distant, and that she recently was married for the fourth time in Las Vegas. He also commented that Jeanne has been great to him, that she had been a good wife to him and cared for him and made him happy. Joseph was concerned about the interaction of Jeanne with Jack and Mary, and it was his request that Jeanne be completely free of them. His statement to Attorney Conathan was that he can handle their behavior but it does upset Jeanne. At this meeting, he requested that two changes be made. He wanted the Southport property title changed as of his death. He wanted Jeanne to be able to sell it and receive the proceeds and, in using precatory language, he stated, “I want Jeanne to provide for my great-grandchildren in some way.” His second request was to delete the $50,000 gift for Jeanne and add Jeanne as a one-third beneficiaiy of the estate (residue of the Trust). At this meeting, Joseph calculated that the estate residue would be about $350,000 to go to Jack, Maiy and Jeanne, less gifts to grand- and great-grandchildren and charities. He told Attorney Conathan that the annuities and the IRA are to be payable to Jeanne as beneficiaiy and he made her joint owner of bank accounts, knowing she would receive them if he died. Joseph Heniy had inherited money from his second wife and he had, as he stated to Attorney Conathan, no qualms about leaving a substantial part of the estate to Jeanne; that it was not as if this money came from Jack and Maiy’s mother.
After this meeting, Attorney Conathan prepared the Joseph F. Heniy Trust Restatement of February 2, 2006 in accordance with Joseph’s wishes of January 5th of 2006.
On February 1, 2006, Joseph F. Heniy was admitted to the Falmouth Hospital suffering from a bronchial condition. Prior to his admission, he had set up an appointment to meet with Attorney Conathan and to go over the changes requested at the meeting of January 5th. When Attorney Conathan went to the hospital on February 2nd of 2006, Joseph was in the Intensive Care Unit and Attorney Conathan and Jeanne entered the unit together. At that time, Joseph was being examined and Attorney Conathan and Jeanne were told to wait outside in the ICU waiting room and someone would come to get them. Approximately ten minutes later, a nurse came to tell Attorney Conathan that Joseph was ready to see him and Attorney Conathan asked the nurse how he was doing, and she responded that he was comfortable and aware. There was no mention that he was taking medication that would affect his awareness. When they met, Joseph had a plastic oxygen mask covering his nóse and his mouth, however he was able to greet Attorney Conathan by name and offered his hand as a gesture. Attorney Conathan said that Joseph was relieved that he had come to see him and that he was grateful. Attorney Conathan asked Joseph to tell him about the changes that he had asked him to make and Joseph said that he wanted Jeanne to have the house and to be able to sell it and to keep the money. He also told Attorney Conathan that he wanted Jeanne to have an equal share of the estate with Jack and Mary. He also repeated that Jeanne was the beneficiaiy of the annuities and the IRA. Without any prompting on Attorney Conathan’s part, he said that Jeanne, Maiy and Jack would share the Infinex account managed by Cheiyl Smith. He knew that the account was the *330 source of funds for the funeral and gifts to grandchildren and bills, et cetera. Attorney Conathan then gave the instruments for Joseph to look at with the requested changes. Joseph said he was okay with it and he asked for a pen and Attorney Conathan had him initial the pages and sign the last page. Attorney Conathan asked him if he was signing voluntarily and Joseph said yes. Attorney Conathan then acknowledged the signature as a notary public. The meeting at the hospital took approximately 30 minutes.
The hospital records reflect that at 8:00 a.m. on February 2, which was Joseph’s second day in the hospital, that his general condition he appeared to be alert, orientated and cooperative. This is a condition which seems to have improved since his admission on February 1, where the chief complaints were an altered mental status. In a patient’s note dated February 1 of 2006, it states the patient was alert with some periods of disorientation, but he was easily re-oriented. It was approximately 4:00 p.m. when Joseph signed the documents in front of Attorney Conathan. He had been on a medical floor until midday when he was transferred to the ICU because of his difficulty breathing. During the course of his stay at the hospital, there were periods of confusion, but it doesn’t appear from the medical record that he was unable to comprehend or to understand his surroundings. He was discharged on February 22 to a tertiary care facility in Boston at the request of his daughter, who was his health care proxy.
For the most part, Joseph Henry had a normal relationship with his two children, John and Mary. The children accepted all of their father’s wives since their mother’s passing, and the father was visited on many occasions by John and the two went on family trips to Ireland with Joseph’s second wife Mary, and John traveled to New York on several occasions when Joseph and Mary had lived in New York. Although it was John’s opinion that his father’s memory had faded, that was contrary to his deposition where he said that his father’s memory was not impaired at all.

DISCUSSION

In addition to the claim of forgery on the trust instrument, of which there is no evidentiary basis, the remaining claims are duress and fraud and undue influence on Jeanne’s part as well as Attorney Con-athan. In order to prevail on a claim of undue influence, it requires the plaintiff to prove by a preponderance of the evidence that an (1) unnatural disposition has been made, (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used the opportunity to procure the contested disposition through improper means. Tetrault v. Mahoney, Hawkes and Goldings, 425 Mass. 456 (1997) citing Heinrich v. Silver Nail, 23 Mass.App.Ct. 218, 223 (1986). Under Tetrault v. Mahoney, undue influence involves some form of compulsion which coerces a person into doing something that a person does not want to do. The evidence in this case does not even remotely suggest that there was some form of compulsion to coerce a person into doing something that the person does not want to do. In fact, on January 5th, prior to the admission to the Falmouth Hospital, Joseph Henry had outlined in an office meeting with Attorney Conathan all of those changes to his estate and it was simply followed up when Attorney Conathan had Joseph Henry execute the documents on February 2nd when he was confined to the Falmouth Hospital in the Intensive Care Unit. There was no urging on the part of his wife Jeanne to change his estate and Attorney Conathan was detailed in his explanation and vigilant in his observations when Joseph Henry signed the documents, and he did not violate any professional obligations.
One of the questions, as in all of these cases, is whether or not the testator made the bequest with full knowledge and intent. One only has to look to his history with Attorney Conathan, in particular his meeting of January 5th, to determine whether or not Mr. Henry had knowledge and had the intent to make the changes that were made on February 2nd. In addition, there was no evidence before this court that Jeanne Henry exerted any influence on her husband to execute the documents of February 2, 2006.
As both counsel point out in their memorandums post-trial, the best description of undue influence is stated in the case of Neill v. Brackett, 234 Mass. 367, 370 (1920), which in part states that: “Fraud and undue influence mean whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammeled desire. It may be caused by physical force, by duress, by threats or by importunity. It may arise from persistent and unrelaxing efforts in the establishment or maintenance of conditions intolerable to the particular individual. It may result from more subtle conduct designed to create an irresistible ascendency by imperceptible means. It may be exerted either by deceptive devices or by material compulsion without actual fraud . . .” There are no circumstances in the evidence before this court that would remotely suggest that Mr. Hemy was subjected to any forces or any threat or the persistent and unrelaxing efforts by anyone associated with this case to create the situation that is now complained of. There were no deceptive devices nor material compulsions. There was no physical, mental, moral or other constraints upon the sound judgment and genuine desire of Mr. Henry.
The defendant is now 91 years old. Admittedly, all of the business dealings were conducted by Mr. Henry with the advice and consult of Attorney Conathan. Although he was of advanced age and suffering from the maladies of old age, he knew what he was doing, he intended to do what he did, and I therefore conclude, based upon the evidence and the credibility of *331 the witnesses, that there was no fraud or undue influence.
With respect to whether or not Mr. Heniy was of sound mind, it is apparently clear and abundantly clear from the medical records that although at times he may have been disoriented, he was able to re-oriented with little effort. The one individual who was in the best position to describe whether or not Joseph Henry had full knowledge and the intent to change his estate was Attorney Conathan. I find Attorney Con-athan to be most credible in his evaluation of Mr. Henry on the date that he executed the documents.

Judgment shall enter for the DEFENDANTS on all claims made by the Plaintiffs.