NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1270                                     Appeals Court

ANNA BAROUNIS  vs.  FOTIOS BAROUNIS & another[1] (and a companion
                            case[2]).

No. 13-P-1270.

Norfolk.     October 8, 2014. - July 30, 2015.

Present:  Green, Rubin, & Agnes, JJ.

Will, Allowance, Construction, Undue influence.

Petitions for probate of a will filed in the Norfolk
Division of the Probate and Family Court Department on September
21, 2009, and February 1, 2010.

The cases were heard by George F. Phelan, J.

Susan E. Stenger for Anna Barounis.
Thomas Frisardi (Kendra Kinscherf with him) for Fotios
Barounis & another.

RUBIN, J.  Before us are cross appeals from two will

contests, involving purported wills of the decedent Antonios

---

[1] Katherine Zosherafatain.

[2] Katherine Zosherafatain & another vs. Anna Barounis.

Barounis (Antonios).[3]  Antonios was married to Lambrini Barounis (Lambrini), who predeceased him; they (collectively, the parents) had three children, Anna Barounis (Anna), Fotios Barounis (Fotios) and Katherine Zosherafatain (Katherine).  Anna filed a petition to probate Antonios's will of November 21, 2003 (the 2003 will).  Nine months later, Antonios's other two heirs, Fotios and Katherine, filed a petition to probate Antonios's will of April 14, 2004 (the 2004 will).  After trial, the judge issued forty-five pages of findings of fact, conclusions of law, and rationale in support of his judgment with respect to the 2003 will, and subsequently the judge issued findings in support of his judgment on the 2004 will.

1.  Background.  In the decade prior to his death, Antonios signed three conflicting estate plans that bear little resemblance to each other.  The trial judge's opinion describes in detail the lengthy and unfortunate factual history behind this case.  We recount his relevant findings.

a.  The 1998 will.  For nearly twenty years leading up to 1996, varying combinations of Antonios, his wife Lambrini, and each of their three children helped to operate a market on property Antonios owned at 532 Tremont Street in Boston, Massachusetts.  The parents retired to Greece in 1996, entering

---

[3] For the sake of clarity, we refer to the parties by their first names.

into a ten-year lease for the market with a third party.
Katherine managed the market from 1996 through 2002, dealing
with financial matters and arranging for minor renovations to
the market. Antonios gave her a power of attorney in 1998.
During 1998 Anna, with her husband, lived in Greece, as did her
parents; her siblings were in the United States. Antonios
shared the same accountant, Angelo Noukas, with Fotios and
Katherine. Apparently in early 1998, Antonios visited the
United States and requested a meeting with Attorney Bruce
Pilavis (with whom Fotios had an attorney-client relationship)
to set up an estate plan; Noukas set up the meeting, which
resulted in a will (the 1998 will) and accompanying documents
(together, 1998 estate plan). Essentially, this estate plan
provided that should Lambrini predecease Antonios, at his death
Anna would receive $10,000, with the remainder of the estate
passing through trust to Fotios and Katherine in equal parts.
Shortly after executing this will, Antonios set up an annuity to
benefit Lambrini and, after her death, Anna. Its value was far
less than half the value of Antonios's estate.

   b.   The 2003 will. Sometime later in 1998, Anna
discovered the contents of the 1998 will and was upset, telling
Antonios that her siblings were much better off financially than
she was, and trying to convince him to change the provisions.
At the time, Antonios took no action. Back in the United

States, Katherine now owned her own restaurant, and Fotios operated Dunkin' Donuts franchises. Anna returned to the United States in 2000, while the parents returned in 2002.

Anna moved into a residential unit at 532 Tremont Street in February, 2003, and she subsequently (with her parents' agreement) began managing the other residential units in the property, even supervising an extensive renovation process during the course of 2003 and 2004. During 2003, Anna spent a lot of time with her parents. During the same year, Antonios asked Anna to find him a lawyer. Anna sought a Greek-speaking lawyer, and contacted one, Chris Pappas, on September 18, 2003.[4] Anna and Pappas had no prior dealings. Pappas's ability to speak Greek was important because Antonios's command of English was "not great." He had minimal ability to read English, could not write it, and spoke only basic conversational English.

---

[4] The judge did not credit Anna's statement that the expressed purpose of the request was to revise the 1998 estate plan, instead finding that the meeting was principally about the market at 532 Tremont Street (specifically, what to do with a long-term tenant paying below-market rent). This finding is ultimately not relevant to our decision. The asserted below-market-rent tenant at the market had a ten-year lease that expired in 2006. Eventually, Attorney Pappas, at the direction of Anna and Antonios, dramatically increased the rent, successfully preventing the tenant from renewing the lease, after which time Anna (through a corporate persona) and Antonios (again, using Pappas as his attorney) signed a fifteen-year lease for Anna to operate the property. Such lease was signed on September 8, 2006. The judge interpreted these facts as further evidence that Antonios desired the market to go to Anna.

Anna drove her parents to their first meeting with Attorney Pappas. It took place on September 25, 2003, and lasted an hour and a half. She was present for the initial discussion of the objective of the meeting, after which Pappas asked Anna to leave the inner office. At the meeting, the parents gave Pappas a large binder of their 1998 estate planning documents, and Pappas reviewed them, explaining their effects in Greek. Antonios indicated that the 1998 estate plan no longer reflected his preferences, because Fotios and Katherine were now well-off financially. Pappas testified that Antonios instructed him that instead, if Lambrini were to predecease Antonios, at his death he wanted to leave "the rest of the property" to Anna.[5] Pappas asked the parents the extent of their property ownership, but apparently based on an answer indicating only their Tremont Street property, he did not discover many of their other assets, including properties in Reading and in Greece. After the meeting, Anna drove her parents home, and thereafter Anna acted as Pappas's "communicant," setting up later meetings and reviewing draft documents with her parents. Pappas never discussed the terms of the estate plan with Anna, instead talking only with her parents about their substantive wishes.

---

[5] The judge did not incorporate this testimony into his findings of fact, and instead found that Antonios had a different intent. See part 2.b., infra.

In late October, 2003, Anna and Antonios traveled together to Greece -- Antonios paid for expenses -- and Anna divorced her husband there.  The judge found that on this trip, as she had back in the United States, Anna urged her father to leave her everything because her siblings were now well off, and her financial situation in light of her divorce was difficult.

Attorney Pappas met with the parents again on November 21, 2003.  First, Pappas explained the main effects of the final 2003 will and accompanying documents (together, 2003 estate plan) to the parents in Greek.  Second, the parties signed each of the four pages in the 2003 will, and two disinterested witnesses initialed each page and signed the final page.  They also executed the remainder of the 2003 estate plan, setting up a trust (2003 trust).  This session lasted an hour and a half.  The 2003 estate plan provides that should Lambrini predecease Antonios, Anna (through the 2003 trust) will essentially receive the entire estate.  It explicitly omits Antonios's other children "inasmuch as they are each well-off financially."

c.  The 2004 will.  With respect to the 2004 will, Angelo Noukas, the certified public accountant, becomes the pivotal actor in the case.  Although Katherine testified that she was unaware of the 2003 will prior to Antonios's death, the judge discredited her testimony, finding that she did know of the relevant provisions prior to the execution of the 2004 will.

The judge found that Fotios was not aware of the 2003 will, nor the 2004 will until after his father's death.  For the prior several years, Noukas had been preparing Fotios's and Katherine's business and personal tax returns along with Antonios's personal tax returns.  Fotios was his largest client by a large margin, providing Noukas with over thirty percent of his business, and he was friends personally with both Fotios and Katherine.

In early 2004, Noukas called Antonios and initiated a discussion about the latter's estate plan, recommending they meet to review it in light of "changes between the Massachusetts and federal estate tax [law]."  Noukas disputed this, claiming Antonios initiated the call, but the judge discredited Noukas's testimony.  They met at Antonios's home, where Noukas, who speaks Greek, cautioned Antonios that "there would be a bad result" if the 1998 estate plan documents were not revised.  Noukas recommended that Antonios retain Attorney Gianpiero Spino, to whom Noukas had recommended clients in the past.  Spino did not speak Greek.  The trial judge discredited Noukas's testimony that Antonios told him that Antonios's desired outcome was for Anna to receive nothing, and that Antonios was unsatisfied with the 1998 estate plan.  Rather, the judge concluded that Noukas had interpreted Antonios's wishes based on incomplete and perhaps inaccurate information.

Antonios and his new lawyer did not meet or talk prior to the drafting of the 2004 will and accompanying documents (together, 2004 estate plan). Rather, Noukas conveyed to Attorney Spino Antonios's purported wishes in a brief initial contact on March 29, 2004, and a subsequent twenty-minute in-person discussion.

Attorney Spino's notes of the initial conversation indicate that the purpose of the plan was to "protect" assets from Anna, who was to receive only a $5,000 bequest, and that Antonios's property was, in the event Lambrini predeceased him, to pass through a trust in equal shares to Fotios and Katherine. He drafted the estate plan on the basis of his discussions with Noukas, and these are its terms. Even compared to the 1998 plan, the 2004 estate plan was harsh towards Anna, cutting her inheritance in half, and imposing on her alone an in terrorem clause that Spino admitted he had added without instruction even from Noukas.

The 2004 estate plan was sophisticated, and around seventy pages. Yet neither Noukas nor Spino reviewed a draft of the estate plan with Antonios before it was finalized. Instead, Spino sent at least one draft of the 2004 estate plan to "persons unknown" and received back handwritten corrections in English.

On April 14, 2004, Attorney Spino traveled to Antonios's home in order to get the 2004 estate plan (including the will) signed, meeting with his client Antonios for the first and only time. Noukas also attended. Over the course of about forty minutes, Antonios first signed extensions for filing his income tax returns, then -- after a brief Greek explanation of the documents from Noukas, who had neither read nor reviewed the approximately seventy pages contained therein, and who testified that he did not spell out for Antonios what he thought the dispositive provisions said -- Antonios signed the 2004 estate plan. He did not read the will, which contained some obvious errors, including the misspelling of the names of his children. On the 2004 will, only the last page was signed and witnessed, although the provision providing Anna with $5,000 was also initialed. Spino spoke during the signing, but in English. Katherine subsequently wrote Noukas a check for $2,500. Noukas paid Spino about $1,700, about $100 to another party who had witnessed the will, and kept the rest for himself. Spino never presented Antonios with a bill.

d. The lower court's judgments. The judge concluded that Antonios had testamentary capacity at the time he signed each will. He found, however, that Antonios was unaware of the contents of the 2004 estate plan, as was Noukas. Antonios had "blindly followed" Noukas's guidance without any actual

understanding.  Therefore, the judge did not allow the 2004 will.

The judge did allow the petition on the 2003 will, but purported to limit the allowance of its dispositive scheme, including its residuary clause.  The judge found that there was no undue influence by Anna, but that Antonios had not known the contents of the 2003 will beyond its bequest to Anna of the market business and the corresponding physical space in the Tremont Street building owned by Antonios.  He ruled that the market would pass to the 2003 trust, of which Anna was the sole beneficiary, but that the rest of the estate would pass by partial intestacy.

On appeal, Anna argues that the judge correctly admitted the 2003 will, but erred in declaring a partial intestacy with respect to Antonios's property other than the market.  The other two children, Fotios and Katherine, argue that the judge erred in not allowing the 2004 will, or that, in the alternative, the 2003 will is invalid either because, given the judge's finding that Antonios did not know the contents of the 2003 will, it cannot be admitted, or because contrary to the conclusion reached by the trial judge, the will is the product of undue influence.

2.  Analysis.  a.  The 2004 will.  We turn first to the 2004 will.  As Fotios and Katherine point out, there is a

longstanding presumption that one who signs a will knows its contents. See Richardson v. Richards, 226 Mass. 240, 245 (1917). Such a presumption is necessary because in every case, by the time of a contest about a will, the person who would know best what the testator knew at the time of signing, the testator himself, will be dead. Indeed, ensuring the accuracy of this necessary presumption is one of the purposes behind the specific procedures that are statutorily required to accompany the execution of a will.

Nonetheless, this presumption is rebuttable. See Dobija v. Hopey, 353 Mass. 600, 603 (1968). There is no Massachusetts case explaining precisely what burden one challenging allowance of a will must meet in order to overcome this presumption. While all other common-law States appear to require one challenging a will on this ground to provide proof only by a preponderance of the evidence, see, e.g., Sansona v. Laraia, 88 Conn. 136 (1914), some speak of the need for "clear" or "satisfactory" evidence. See, e.g., Pepe v. Caputo, 408 Ill. 321, 325 (1951) (when "a will [has] been prepared at the request of the testator" and has been duly executed, a contestant must put forth "clear and satisfactory proof" that the testator did not understand what the will contained); In re Gannon, 73 Misc. 325, 334 (N.Y. Sur. Ct. 1911) (stating that the "presumption must prevail until counterbalanced by very satisfactory evidence

to the contrary"); Boehm v. Kress, 179 Pa. 386, 388 (1897) (stating that when a will "found to have been executed by a man possessed of full testamentary capacity and subjected to no undue influence, is to be set aside on the ground that he did not have a full understanding of its nature, and did not execute it for what it purports to be, and for what it on its face is, a will, it should be on very clear evidence").

Even assuming the need for "clear" evidence in support of a finding that a testator did not as a matter of fact know the contents of the will he executed, we think the standard was met here.  The judge made several subsidiary factual findings in support of his conclusion that "[Antonios] was unaware of the contents of the 2004 will and trust."  We cannot say that any of these findings of fact were plainly wrong.  Matter of the Estate of Moretti, 69 Mass. App. Ct. 642, 650-651 (2007) (stating that in probate proceedings a judge's findings of fact stand "unless they are plainly wrong") (quotation omitted).

Antonios did not read English, nor could he speak it in any sophisticated way.  Noukas advised Antonios that he should revise the 1998 estate plan documents to avoid probate issues, recommending Attorney Spino.  The judge did not credit Noukas's testimony that Antonios expressed his wishes to Noukas.  Rather, he found that Noukas had provided his own interpretation of Antonios's wishes based on unknown information.  The judge found

that Attorney Spino, who prepared the will, did not speak Greek and never spoke with Antonios before meeting with him to sign the will; Spino's only source of information was Noukas. At that meeting, whatever provisions Spino explained to Antonios, he did so only in English. Noukas spoke to Antonios in Greek, but when asked if he had described the substance of the dispositive provisions of the 2004 will (which the judge found Noukas had not himself read), Noukas testified, "[I]t was a lot more simpler [sic] than that. It was, did you do what I told you? And I said yes. And, you know, that was it." In light of this, we see no error in the judge's conclusion that Antonios did not know the contents of the will, and we conclude that, should clear evidence be required to support such a finding, it was supported by such evidence. Consequently, the judgment disallowing the 2004 will must be affirmed.

b. The 2003 will. With respect to the 2003 will, the judge found that Antonios understood the contents of the will only to the extent that it conveyed the market -- which the judge construed to mean the business and the physical space in which it was located -- to the 2003 trust, of which Anna was the sole beneficiary, should Antonios survive Lambrini. As a result of that finding, the judge reformed the will so that Anna, through the 2003 trust, would get the market, and the rest of Antonios's property would pass through intestacy.

Of course, in Massachusetts reformation of wills is not permitted. Flannery v. McNamara, 432 Mass. 665, 673 (2000) ("Reformation of wills is presently prohibited in Massachusetts"). Even "[t]he fact that [the will] was not in conformity to the instructions given to the draftsman who prepared it or that he made a mistake does not authorize a court to reform or alter it or remould it by amendments." Mahoney v. Grainger, 283 Mass. 189, 191 (1933). Reformation of the will by the judge, whatever its equities, was not a tool available to him.[6]

Fotios and Katherine argue that if the finding of lack of knowledge of contents is fatal to the 2004 will, it is equally fatal to the 2003 will. An examination of the record, however, shows that it does not support a finding that Antonios did not know the contents of the 2003 will.

The judge made two relevant factual findings concerning communication between Antonios and Attorney Pappas. First, he found that in meeting with Pappas, Antonios's initial wish "was to leave everything to [Lambrini] if she survived him but if not

---

[6] There are cases holding that extrinsic evidence may be used to assist in interpretation of an ambiguous provision of a will. See, e.g., Polsey v. Newton, 199 Mass. 450 (1908). The judge in this case, however, did not purport to interpret the language of the will in reaching his result. Rather, he concluded that the residuary clause was to be "of no effect," and that assets other than the market and its physical space were to pass through intestacy, thus purporting to reform the will.

then the market store specifically should go to Anna."  Later, the judge found that in a one and one-half hour meeting conducted in Greek at the attorney's office, Antonios's instructions were that his property should go "all to [Lambrini] if she survived but if not then the market should go to Anna."

These findings are unsupported.  The judge credited Attorney Pappas's testimony, but Pappas testified that "one of [Antonios's and Lambrini's] wishes" was to give the "Athens Market business" to Anna.  He did not testify that Antonios's wishes were limited to the market.  Rather, he testified that Antonios initially told him that if Lambrini were to predecease him, on his death "the rest of the property" should pass to Anna.  Pappas also testified that he explained -- in Greek -- the dispositive provisions of the will to Antonios again at the time the will was executed, after which Antonios said "yes" to Pappas's question "[D]oes this express your wishes?"  In light of this, we cannot say that the evidence supports a factual finding that Antonios did not know the contents of the 2003 will.

Fotios and Katherine also argue that the 2003 will was the product of undue influence.  The judge's amply supported findings of fact, however, support his conclusion that, while the will undoubtedly reflected Anna's influence, such influence did not amount to compulsion that coerced Antonios.  Compare

Heinrich v. Silvernail, 23 Mass. App. Ct. 218, 227 (1986). The 2003 will was executed by Antonios based upon his own independent judgment of the equities of the situation, in which Fotios and Katherine were, in fact, in a better financial situation than Anna. Given the judge's supported findings of fact, there is no error in his conclusion that Anna's influence, while significant, was not "undue."

3. Conclusion. So much of the judgment on the 2003 will (Docket No. 09P2372EA) as limits the disposition to the market business and corresponding physical space at 532 Tremont Street, Boston, is reversed, and the judgment shall be modified to admit the 2003 will in full. In all other respects, the judgment is affirmed, as is the postjudgment order dated November 30, 2012.

The judgment on the 2004 will (Docket No. 10P0236EA) is affirmed.

So ordered.